Davis, J.,
delivered the opinion of the court:
The claimant contracted to carry the mail once a week between Phoenix, Ariz., and Prescott, the capitol of the Territory, upon a schedule which required him to leave each end of the route upon the same day, arriving at the other end in ninety-six hours. The distance being not far from 100 miles this required an average speed of a little over 1 mile per hour. The mail was, however, never in fact carried in this way; on the contrary claimant agreed with the postmasters at the termini to start from each end of the route on days so far apart that one horse and carrier could perform the service which otherwise would have required the-service of two horses and two carriers. This kind of agreement made by postmasters, described in the regulations as “ trusted agents ” of the Government, is customary, necessarily so when the shifting methods of communica *183 tion in a new, vast, and growing country are considered. Changes in the running time of trains, changes in the lines of road, changes in business methods, and the extension of railroads which entirely alter the mail requirements of a district, are matters peculiarly within the knowledge of the local postmasters, and to the discretion of these “trusted agents” much must be committed, subject, of course, to the supervision of the Department in Washington. Claimant’s agreement with the postmasters was in due course sent to Washington, was not disapproved, and-was acted upon presumably with the knowledge of the Department, whose agents (the postmasters) were in accordance with regulations reporting regularly as to the contractor’s work, and whose other agents, the inspectors, were presumably attending to the duties imposed upon them of carefully watching over the Government’s interést in regard to this as well as all other star routes.
The claimant therefore began the performance of his contract not by leaving Phcenix and Prescott on the same day, but by sending a man on horseback from Phoenix to Prescott, who in due course returned over the route; all within the schedule time. The Government therefore had a ninety-six-hour trip once a week each way, but the days of departure were by the postmaster’s consent and without objection or complaint on the part of the Department changed from those specified in the schedule annexed to the contract.
Every Government officer is presumed to know his duty and to honestly perform it. The Government, like any other employer, is responsible for the acts of its agents within the limits of the power given them, and it is as much bound as a private citizen to employ honest and competent men. There is nothing to show that the individual officers who were concerned in the case now at bar did not so act in regard to it; nor do we understand that counsel for defendants so allege, although certain intimations have from time to time escaped in the argument tending to show a suspicion by the Govenment of its own agents.
In the case at bar we practically have to consider only questions of law, for whether the money paid the claimant was legally paid him or not, whether he has a right to recover the balance he alleges to be due him or not, depends principally upon a construction of the statutes and of the Depart *184 ment’s regulations and power. The amount he received and that which he claimed to be still due is a reasonable and just sum for service actually performed, a sum. which, if he could recover at all upon a quantum meruit, he would be entitled to receive. There is, however, one question sounding somewhat in fraud or deceit which we shall first consider.
Turning to the history of the case we find the claimant nnder contract to carry the mail over the Phce nix-Prescot fc route once a week, at the rate of 100 or so miles in ninety-six hours, leaving each terminus the same day, the last condition being changed by agreement, not disapproved by the Department, so that with one horse and carrier it was physically possible to make' the round trip on the ninety-six-hour schedule.
The bid for this contract was made in May, 1878; the contract was made in August, 1878, and was to run from October 1,1878, to June 30,1882.
In September, 187S, some twenty days before any duty under the contract fell upon the claimant, he sent two statements in writing to the Post-Office Department, both made upon the same day and both verified under oath. Upon these statements the defendants’ case largely turns, for they claim that the statements were untrue in fact and that théy were intended to mislead and did mislead the Department, which had a right to trust in them.
In one of these documents claimant said in substance that if the service on the route were to be reduced in running time, i. e., “ expedited,” as contemplated by the people and officials then petitioning, so as to run through in two days instead of four days (ninety-six hours), he would need to use eight horses and three carriers, while on the existing schedule of ninety-six hours, stock and carriers necessary would be one carrier and one animal.
Olaimant’s other statement, made the same day, and which it may be assumed was before the Department, with the one already described, contemplated a reduction of running time from four days to two and one-half days. As to that claimant said:
u Stock and carriers necessary to carry mail upon present advertised schedule of four days, one trip per week, would be one carrier and two animals. To increase the speed so as to transport mails through in two and a half days, would require seven animals and three carriers.”
*185 Two points will immediately strike any one who reads these statements: First, the advertised schedule required claimant to leave both ends of the route on the same day; this he could not do with one carrier and one animal or with one carrier and two animals. Second, he says in one instance that under the then existing schedule he required one carrier and one animal, and in the other that he required one carrier and .two animals.
These two statements made on the same day, and containing these two discrepancies patent on their face, discrepancies which could not escape the eye of any one, and must have been immediately seen by a trained and experienced Government official, cannot be held as intended to deceive, or as in fact deceiving or misleading the defendants’ agents. They are apparently the result of the agreement with the terminal postmas-' ters and of carelessness, or of incorrect judgment; it should further be remembered that claimant had not yet begun work under his August contract, so that he is not stating an existing fact, but his estimate of what he will need to fulfill the duties imposed by it upon him, as well as his estimate of what he will need should an expedition be ordered. Both statements are in effect mere expressions of opinion; they are on their face estimates, not statements of fact.
Whatever the claimant knew about this route theDepartment knew; the system there in force for the collection and arrangement of information as to these routes is confessedly a very thorough and perfect one, and with the aid of the local postmasters and the officers of the inspectors’ division the Department was in a position to exactly investigate the state of affairs in Arizona with the needs and expense of the service there.
Nothing more appears to have been done in the matter until November 29,1878, that is, nearly three months after the September statements (upon which up to that time no action seems to have been taken) when the claimant offered to perform triweekly service on the route upon an expedited schedule of one-half the running time as advertised, that is, one-half of ninety-six hours, for the total annual payment of $8,850, stating at the same time, what subsequent events proved to be true, that the route being the shortest and most direct to the capital of Arizona it would in time become the route upon which the entire mail would be transported. Three days thereafter the De *186 partment ordered the service increased to two trips per week, ordered it expedited from ninety-six hours to forty-eight hours, that is, ordered the speed doubled, and ordered the contractor to be allowed $8,170 per annum additional compensation, “ being less than pro rata, but in accordance with his written agreement.” This was done. In June, 1879, the trips were increased to four per week, running time was reduced to thirty-two hours, and for -this service proportionate additional pay was allowed and paid until January, 1882.
The defendants’ counsel has set up and urged with great zeal and ability a counter-claim, upon the theory of which they not only deny claimant’s right to a judgment, but also claim to recover for amounts already paid him under alleged fraud or mistake in that the allowances made were founded upon a false state of facts, and the Department was misled by the claimant.
The statutes relating to increased or expedited service are found in sections 3960 and 3961 of the Bevised Statutes. They provide, first, as to additional service, that compensation shall not be in excess of the exact proportion which the original compensation bears to the original service (§ 3960). This is a very simple provision, and a result can be reached in regard to any case arising under it by the application of the rule of three — one trip so much, two trips not more than twice as much.
As to the expedition or increase of speed there is more difficulty. The statute (§ 3961) provides that no extra allowance shall be made on this account unless by such expedition increase of stock and carriers is made necessary, and then the additional compensation “shall bear no greater proportion to the additional stock and carriers necessarily employed than the compensation in the original contract bears to the stock and carriers necessarily employed in its execution.” This statute may for illustration be resolved into a very simple algebraical problem : a being the present number of stock and carriers necessary, b being the present compensation, c being the necessary increase of stock and carriers, and x being the statutory increase of payment, we construct this proportion : a,:b::c:x. Putting this into figures, again for illustration, and calling the present number of stock and carriers (a) 10, the present compensation (b) $5,000, and the increase of stock and carriers necessary for expedition (c) 5, we reach the following result: *187 10: $5,000 : : 5 : (a?) $2,500. That is, the contractor should receive, in this hypothetical case of an increase of one-half in his force, one-half more pay; and if his service is at the same time doubled in number of trips, then he is entitled to multiply this gross result by two. Thus in this instance he would receive for one expedited trip $7,500, and for two such trips $15,000, whereas on the single slow-time trip he received but $5,000. Reduce the time again one-half, and then again double the trips (all on the same theory of fact), and there is a very important increase, fully authorized by law, provided the additional stock and carriers are in fact made necessary.
Theimportance of the illustration is in this: Suppose the third term of the proportion, the multiplier, be overstated, or suppose the first term, the divisor, be understated, or, finally, sup pose that both facts concur, the third term is overstated and the first term understated, then in either instance an incorrect conclusion is reached and the Government pays more than the statute authorizes. Three illustrations from the preceding hypothetical case will show the effect of this: 10 : $5,000 : : 20 : $10,000; here the increase of stock and carriers, the third term, is exaggerated; or, 5 : $5,000 : : 10 : $10,000: here the present amount of carriers and stock is understated; or, 5 : $5,000 : : 20 : $20,000; here both errors are present, and the Government pays $20,000 for service worth only $2,500. The room for fraud is great; by cutting off a carrier from present service, or by adding a carrier to the estimate for contemplated service, a result is obtained entirely out of proportion to the apparent extent of the deceit, mistake, or fraud. It is popularly supposed that much money has been dishonestly taken from the Treasury through this or similar methods. Defendants endeavor to show that this was such a case, and for that purpose they principally rely upon the two affidavits of September 10,1878, claiming thatthe contractor coaid not have performed the service called for in his agreement with one horse and carrier, or with two horses and one carrier, as then he could not send the mail from each end of the route upon the same day and at the same time. Of course he could not, and that fact being patent would not have escaped the notice of the Department authorities and could not have misled or deceived them. A self-evident absurdity can deceive no one, and we know of no principle of law which allows such an allegation to form the basis of an action for fraud or deceit.
*188 The agreement with the terminal postmasters, presumably approved by the Department, also lends light to the position of the Government and the claimant at the same time.
Further, the claimant did not state what stock and carriers he was in fact using, for his communication was made twenty days before his contract began to run, which the Postmaster-General knew; but he stated what would be necessary to use, and one horse and carrier, as the findings show, would be sufficient to make the round trip of 200 miles in a week, carrying nothing but a light mail.
It further appears that nothing was done by the Department at the time these affidavits or statements were made; no order was then issued; neither schedule contemplated in the statements was adopted, and matters remained in statu quo until the end of the following November, when an entirely separate and distinct proposal was made by the claimant to do a different service for a sum stated. December 2, 1878, claimant was ordered to proceed upon the terms of this proposal.
We cannot agree that the September affidavits influenced the Postmaster-General’s action, for we see no connection between them and the proposal of November 29; and we cannot agree that they were false in fact. The theory, therefore, that by claimant’s deceit he led the Post-Office Department into the error of supposing less carriers necessary for the then existing mail service than were in fact necessary; that, rightfully relying upon this, the3r reduced the first term of the proportion for increase, and that so, having started in error, all subsequent additions to compensation were based upon the same mathematical mistake, and were therefore too great, we cannot concur in. The Government’s position on this branch of the case turns upon this proposition as stated in their brief when speaking of the proposal of November 29:
11 It was, of course, wholly outside the powers of any officer to accept such a proposition as this after the contract had once been let according to law, unless the terms of it fell within the limitations governing allowances of extra pay, as contained in the sections of the Revised Statutes. * * * But assuming to believe the one horse and one man affidavit, and that an increase of 450 per cent, in stock and carriers would be rendered necessary by the change, the vigilant official then guarding the public interests in star-route matters made the order of December 2.”
*189 There is nothing to show that the Government officers did not act honestly; there is nothing connecting the September statements as to a two day or two and one-half day weekly schedule with the November proposal and the December order for two forty-eight-hour trips weekly.
The Department had other sources of information much more to be depended upon than the ex parte opinion of any contractor — sources of information provided by law, which it was bound to consult and presumably did consult. Finally, as one horse and carrier could, in fact, perform the service under the schedule as changed, there was nothing false in the statement, which, at most, was a careful expression of opinion under oath, made prior to actual performance under the contract.
It further appears that the mail service was always properly and satisfactorily performed, and that the price paid was a fair and reasonable one under all the circumstances. The defendants, therefore, are thrown back upon questions of law relating to the power of the Department to make the increase in compensation which was made.
The proposal of November, 1878, for expedited and increased service, with the order made thereon, did not constitute a new contract, but made simply an alteration of the existing contract in a manner provided by its terms and authorized by statute. No new contract for mail letting on star routes could be made by the Department except after advertisement, and the phraseology of the proposal and the indorsement on it show an intention to alter an existing service, not to contract for a new one. Existing service was to be increased and was to be expedited, and in doing this the Department, in accepting claimant’s bid on the ground that it was less than pro rata, impliedly recognized the fact that the transaction was one covered and limited by the provisions of sctions 3980 and 3961 of the Eevised Statutes.
Garfielde’s Case (93 U. S. R, 242) is not authority for holding an agreement such as this a new contract, for in that ease the proposal was an original one for the service, made after advertisement in the manner prescribed by law, and the court held that the Department’s acceptance of the proposal created a contract. In that case there were no existing contract relations between the parties, and no question of expedition or increase; whereas in the case at bar Griffith was bound to in *190 crease or expedite the service he was performing when ordered to do this on certain fixed terms, and these terms could not be altered by the Department, for they were prescribed by law, and if not satisfactory to Griffith, he was without remedy other than a surrender of his contract.
Itis urged that, the Postmaster-General having acted in this matter and no fraud or mistake being shown, this court is without power to review his decision, and cannot substitute its judgment for the judgment of the Postmaster-General.
The general principles governing the question of judicial review of the action of an executive officer in exercising a discretionary power vested in him by law have been thus stated by the Supreme Court:
“ Whenever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction that the statute constitutes him the sole and exclusive judge of the existence of those facts.” {Martin v. Mott, 12 Wheat., 419.)
The fraud for which a court of equity will intervene to grant relief by setting aside a judgment or decree between the same parties rendered by a court of competent jurisdiction is one extrinsic or collateral to the matter tried, and not a fraud which was in issue in the former suit. Such relief has been granted in cases wherever, by fraud or deception practiced on the unsuccessful party, he has been prevented from exhibiting fully his case, by reason of which there has never been a real contest before the court of the subject-matter of the suit. (United States v. Throckmorton, 98 U. S. R., 61.) In the case last referred to it was sought, by a bill in chancery, to set aside a patent for certain lands in California claimed under a Mexican grant. The patent had been issued by a board of commissioners appointed for that purpose under treaty provisions, and the allegation of the bill was that the claimant had procured a decision in his favor by forgery and by perjured testimony, and by this fraud “ the law agent of the United States was misled, the United States [the orator] deprived of all opportunity to contest the confirmation, and the Land Commissioner and court were deceived into confirmation of the claim.”
The opinion below was delivered by Mr. Justice Field, who said (Throckmorton v. The United States, 4 Sawyer, 42):
“ Here * * * we have a special tribunal, established for the express purpose of ascertaining and passing upon land de *191 rived from Spanish or Mexican authorities, clothed with ample power to investigate the subject and determine the validity of every claim and the propriety of its recognition by the Government, capable as any court could possibly be of detecting the fraud connected with the claim, and whose inquiry in every case was necessarily as to the authenticity and genuineness of the documents upon which the claim was founded. * * * On principle such adjudications cannot be reviewed or defeated by a court of equity upon any suggestion that the commissioners and court misapprehended the law, or were mistaken as to the evidence before them, even if that consisted of fabricated papers, supported by perjured testimony. The very questions presented by the present bill were necessarily involved in the proceedings before the commissioners of the District Court, and the credibility of the testimony offered was a matter considered by them. * * * The bill avers that the alleged grant was not genuine because it was antedated. But the genuineness of the document was the matter subjudice, and could not have been established and the claim based upon it affirmed except by evidence to the commission and court that it was made at the time stated.”
The learned justice then, alluding to the doctrine that fraud vitiates all transactions, even the most solemn, says that this doctrine—
“ cannot be invoked to reopen a case in which the same matter has been once tried, or to put in issue between the parties that it might have been tried. The judgment rendered in such a case is itself the highest evidence that the alleged fraud did not exist, and estops the parties from asserting the contrary. It is afterward mere assumption to say that the fraud was perpetrated. The judgment has settled the matter otherwise; it is res judicata. The frauds for which a court of equity will interfere to set aside or stay the enforcement of a judgment of a court having jurisdiction of the subject-matter and the parties must consist of extrinsic collateral acts not involved in the consideration of the merits. They must be acts by which the successful party had prevented his adversary from presenting the merits of his case, or by which the jurisdiction of the court has been imposed upon.”
How, as to the powers and duties of the Postmaster-General, we find that he is to furnish to postmasters schedules of the time of arrival and departure of the mail at their several offices, to notify them of any changes therein, and to cause to be kept and returned to the Department, at short and regular intervals, registers showing the exact time of the arrival and departure of the mail (Rev. Stat., § 3841); a division of in- *192 specfcors is to examine these registers, also the certificates of route agents and reports of mail failures, to note contractors’ delinquencies, to prepare cases thereon for the action of the Postmaster-General, and to perform other duties necessary to secure a faithful and exact performance of all mail contracts and service. (Regulations 1873, p. 148.) The Postmaster-General eral is authorized to make deductions, not exceeding a maximum fixed, from the pa.y of contractors for failure to perform service according to contract, and to impose fines for other delinquencies. (Rev. Stat., § 3962.) The Postmaster-General has power to establish post-offices at such places on post-roads established by law as [he] may deem expedient (§ 3829); he prescribes the penalties on postmasters’ bonds (§ 3834); he may appoint postmasters of a certain class (§ 3836); he may temporarily fix the salary on new offices (§ 3853), and shall readjust the salaries of postmasters (§ 3854); he may designate distributing or separating offices (§ 3859); he may discontinue a post-office (§3864); he fixes th'e salary of letter-carriers (§ 3866) and prescribes, their uniform (§ 3867); he may establish branch offices (§ 3871); he may, upon evidence “ satisfactory to himself,” return certain registered letters as “fraudulent” (§ 3929); he may discontinue a post-road when “ in [his] opinion it cannot be safely continued” (§ 3974). In case of contractor’s delinquencies the Postmaster-General judges of the sufficiency of the contractor’s excuse and fixes the amount of the fine. (Regulations, §§ 279-284.)
It is shown by these citations that the law-making power intended to give to the Postmaster-General great power of discretion in the management of the mails and post-roads, and committed much to his opinion and good judgment. Such a policy is necessary, for no such service can be strictly mapped out and defined by statute, and its changing needs require the attention of an executive officer vested with power of management. Bearing in mind this general policy, we turn to the statutes now in question.
Section 3960, dealing with increase of service, limits the max-mum of allowance to the exact proportion which the original compensation bears to the original service. . Section 3961, dealing with expedition, limits the extra allowance therefor, first, to cases wherein the employment of additional stock and carriers is made necessary by the expedition, and then provides *193 that the additional compensation shall bear no greater proportion to the additional stock and carriers necessarily employed than the compensation in the original contract bears to the stock and carriers necessarily employed in its execution.
The Postmaster-General decides, first, whether expedition is necessary j and if this be settled in the affirmative, then, second, whether thereby additional stock and carriers are rendered necessary; and if they are, third, the number of stock and carriers now necessarily employed in the existing service$ and, fourth, the number of stock and carriers necessarily to be employed in the expedited service. It will be noticed that any decision on these questions involves largely mere estimates or opinions. The stock and carriers actually employed may not be the number necessarily employed in mail service $ a portion perhaps being used for freight, passenger, or express business, while a determination of the number to be employed in the future is purely a question of estimate, calling for the good judgment of an expert.
The power of ascertaining these facts and making these estimates is exclusively vested in the Postmaster-General. The decision is the result of his judgment and discretion. From it there is no appeal to this court, and no fraud has been shown authorizing an interference by us on that ground. (Butterworth v. Hoe. 112 U. S. R., 64.)
To authorize relief on the ground of mistake, the mistake must have arisen from ignorance, imposition, or misplaced confidence. An act done intentionally and with knowledge cannot be treated as a mistake. (1 Story, Eq. Juris., §§ 110, 140.)
The Postmaster-General had to aid him in the decision of this case the vast and complete machinery of his Department, and must have had all the information as to this route which it was possible for any one, including this contractor, to obtain. The local postmasters were reporting to him regularly, while the officers of the inspection division were watching this route as they did all other star routes, and, in fulfillment of the duties placed upon them by the Begulations, were keeping the Department informed as to the business being done and the manner in which it was done. To establish ignorance on the part of the Department of the facts in this case, the defendants must assume that the governmental agents were absolutely derelict in duty — an assumption which is not to be entertained; nor *194 would it lead to a decision in defendants’ favor, for a mistake, to be available in equity, must not have arisen from negligence where the means of knowledge were easily accessible. Further, the Government has long assented to the mistake, if mistake were committed; and having been so long silent, having assented to the performance of the contract in the manner in which it has been performed, it is now too late to tear it open. The Government knew what was being done by Griffith; the findings show that his route was constantly inspected; and knowing this, they allowed him to go on. The Supreme Court has announced as law that, where a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose and adhere to it. If he be silent, he will be held to have waived the objection, and will be as conclusively bound by the contract as if the mistake or fraud had not occurred. (Grymes v. Sanders, 93 U. S. R., 55.)
The facts in this case do not require us to decide how far this doctrine is applicable to the Government in contracts for mail service.
The defendants, however, contend, under section 4057, Revised Statutes, that they are taken out of the general principles of equity and placed in a much more advantageous position. That statute authorizes the Postmaster-General to bring suit to recover money paid out of the funds of the Post-Office Department under either of the following circumstances: (a) Under the pretense that service has been performed when in fact it has not been performed; (d) for increased service actually rendered when the additional allowance exceeds the sum which according to law might rightfully have been allowed therefor; (e) all other cases where money has been paid to any person in consequence of fradulent representations, or by the mistake, collusion, or misconduct of any officer or other em-ployé of the Department. We do not find on the facts of this case that it is one embraced by this statute. The additional allowance was not in excess of the maximum permitted; there is no fraud shown on the part either of the contractor or a post-office employé; nor do we find that there was mistake in fact.
The action of the Postmaster-General was in its nature one of opinion, of estimate, deduced from all the information which his Department could procure. Whatever representations *195 were made to him by the contractor were of the same nature. The number of horses and men necessary in the future to carry a mail over a given route where passengers and freight are carried by the same conveyance can be but an estimate, which may or may not stand the test of experience. It is apparent from the subject-matter of this case that whatever was stated must have been understood by the party to whom it was addressed as an expression of strong belief only, because it is a subject-matter of which knowledge in the strict sense cannot be had.. (Page v. Bent, 43 Mass., 374.)
“From the nature of the subject in relation to which the certificate was given the estimate of value was nothing more than a conjectural opinion, which, whether true or false, constituted no legal cause of complaint.” (Gordon v. Butler, 105 U. S. R., 558.)
We therefore conclude, from this examination, of the facts and authorities : The Postmaster-GenéraPs action was so far final that it can be impeached only for fraud or mistake; that no fraud or mistake is shown in the case; and even if a mistake were committed, it was, under the circumstances, one merely of opinion or estimate, and was not of a character, especially after it had been so long assented to, to authorize a recovery.
It is a question, not necessary to decide in this case, whether the Postmaster-General, in estimating the pro rata increase for expedition, may reduce the highest figures stated by the contractor as necessary for present service. No one has better means than the contractor for knowing what force he is employing on an existing contract, and it may be doubted whether the Postmaster-General could adopt any hypothesis more favorable to the contractor than is contained in his own statement, or when there are two statements, then, than that contained in the statement whose terms are least favorable to the interests of the contractor. The action of the Postmaster-General within a reasonable time after the receipt of contractor’s statements or affidavits might be an indication that he acted under “mistake” in accepting of two statements the one most favorable to the contractor, and in disregarding the one most favorable to the Government, whose agent he is. In this case, however, it does not affirmatively appear that the Postmaster-General acted on the affidavits, and circumstances indicate that he did *196 not. About three month elapsed before he acted at all. The affidavits were made when the primary contract had not gone into operation, consequently their statements were necessarily conjectural. During the interval the contract did go into operation, and after conjecture had given place to experience the contractor made a new proposition, upon which the Postmaster-General did act. Too many uncertainties attend the transaction to warrant a court in concluding that a mistake occurred or that an error was involved in the expedited contract.
Counter-claim dismissed.
Judgment for claimant in tho sum of $24,480.24.