Nott, J.,
delivered the opinion of the court:
This case presents and involves a number of distinct propositions, which may be set forth and discussed without its being necessary to narrate the history of the controversy.
1. The statutes regulating “ contracts for carrying the mail” contain this provision:
“ The Postmaster-General may make deductions from the pay of contractors for failures to perform service according to contract and impose fines upon them for other delinquencies. He may deduct the price of the trip in all cases where the trip is not performed, and not exceeding three times the price if the failure be occasioned by the fault of the contractor or carrier.” (Rev. Stat., § 3962.)
That is to say, the Postmaster-General “may deduct” the price of a trip from a contractor’s compensation if the failure to perform was not his own fault, and he “ may deduct ” not exceeding three times the price if the failure was occasioned by the fault of the contractor or his carrier. It is not to be supposed that this power to deduct from the compensation of a contractor is a magisterial power or that the Postmaster-General is invested with judicial authority to impose forfeitures and penalties as such upon the individual citizen. No man is obliged to be a'mail contractor against his will; and the statute is operative against no man until by voluntarily entering into a contract or performing a mail transportation service he expressly or impliedly agrees to submit the differences which may arise to the arbitrament of the Postmaster-Gen eral. The only effect *358 of the statute is that it requires the Post-Office Department to exact this agreement from all mail-carriers, and that it takes such contracts to this extent out of the ordinary rules of law which regulate penalties and liquidated damages. When any contractor fails to perform, he of course loses his right to compensation 5 but when a mail contractor fails to carry the mails as he has agreed to do, he causes a public inconvenience, the value of which can not be proved in dollars and cents or estimated by courts and juries. Accordingly this system has been devised, whereby the decision of the Postmaster-G-eneral is made final as to fines and deductions — as to whether the contractor was in fault or was not iu fault.
If the Postmaster-General determines that the failure to perform was not caused by negligence, he loses only the compensation which he has not earned; if it be determined that the failure was through his fault, he loses what is termed a fine, but what is really a limited amount, more in the nature of liquidated damages for the public inconvenience which his negligence has caused. And these' decisions of the Postmaster-General in cases properly within his jurisdiction are final, though it may well be that where the failure to perform was due to some cause for which the law will not allow a contractor to be held responsible, the decision will be subject to review iu the courts. The vast area of the Post-Office system, its complexity of routes, the remoteness and distance of its operations from the seat of the Government, require that a summary method of dealing with its innumerable contractors and subcontractors shall exist, though its administration may often involve instances of individual injustice. The present case, as will hereafter appear, illustrates the necessity of such a system and the effective manner in which it can be administered.
2. The power to impose a fine can be exercised as long as there is money remaining due upon the contract. The fact that an account of a certain quarter has been transmitted to the accounting officers of the Treasury and adjusted and a balance certified and paid does not preclude the Postmaster-General from imposing a fine for a previously committed but subsequently discovered delinquency. A mail transportation contract is an entirety for entire period of service. The payment by installments is merely for the convenience of the parties, and the adjustment of quarterly accounts is merely to enable *359 tbe payment to be made by installments. So long as any money remains due to the contractor it will be the duty of the Postmaster-General to protect the Government by withholding money for services not rendered or by imposing fines for delinquencies previously unknown. The fact that the contractor concealed Ms delinquency until his quarterly account had passed does not relieve him from this liability; and if a part of the consideration of the contract remains unpaid, it is just as effective authority for the action of the Postmaster-General as if the whole remained unpaid. Tn other words, the accounts between the contractor and the Government remain open so long as anything remains to be adjusted or paid.
3. Conversely, the authority to impose fines is limited to the subject-matter of the contract and to the payments which would otherwise be due to the contractor. A fine is neither an award upon which an action can be maintained nor the judicial determination of a legal right which can be enforced in another forum. Whatever the form may be, the fine is simply the withholding of moneys due to the contractor. Such is the language of the statute and the reasonable import of these contracts. The Postmaster-General “ may deduct the price of the trip in all cases, and [he may deduct] not exceeding three times the price if the failure be occasioned by the fault of the contract- or,” but he can do nothing more than “ deduct.” The power to impose a fine is one which is not known to the common law and can not be enlarged by inference or intendment. Its remedy must be found in the specific contract which authorizes it. The Postmaster-General can not satisfy it out of the property of the contractor nor deduct it from other moneys which the Government may happen to owe him. The liability of a contractor in this matter of fines begins and ends with his contract.
4. The court is of the opinion that the power of the Postmaster-General to impose a fine was properly exercised in this case.
It appears that in 1881 the claimant held a contract to carry the mail seven times a week between Ooulson and White Sul-phur Springs, in Montana. Between these termini were two intermediate post-offices, Olden and Martinsdale. There was little or no passenger travel over the route, and the contractor simplified the performance of the service by sending out the *360 mail daily from each terminus, but sending it no farther daily than to the' next intermediate post-office, where it would lie over from one to six days and then be sent on sometimes once and sometimes twice a week. The distance between Olden and Martinsdale of seventy miles was seven-sixteenths of the route, so that on one-half of the route the service was seven times a week and on the other once or twice. The mails thus arrived and departed seven times a week from each terminus, and the postmaster at each terminus certified to the daily arrivals and departures seven times a week, and the Post-Office Department paid for carrying the mails seven times a week. This state of things continued until an inspector chanced to go over the route on a day when there was no through mail, and was greatly astonished to find when he reached an intermediate post-office that he could go no farther, and would have to wait two or three days until this daily mail resumed its weekly transit. The manner in which the service was performed and the semicivilized condition of the country through which the mail was carried will be best understood by an extract from the narrative of the witness:
“When I arrived at Olden I made myself known to the gentleman in charge of the post-offiee there, whose name was Hamilton — Bill Hamilton — and 1 told him I was en route to Mar-tinsaale, going over the line as a post-office official to ascertain the necessities of the service there, and he remarked to me that it might be doubtful whether I could get over for a day or two or two or three days, because they had no conveyance.
“At Olden the postmaster there had gone; nobody seemed to know who he was or where he was. He had left that country a long time before, and Mr. Hamilton, who was a partner, or said he was a partner, of Mr. Olden in the store, conducted the post-office, signing the name of the postmaster, Joliff; but he told me he did not know Joliff, had never seen him, and did not know where he was or when he left there. I remember I suggested to Hamilton that he had better be appointed postmaster himself; he was a kind of Western sort of a fellow, and he said that when he first took charge of the office he signed his own name aud the Department returned the papers; they would not accept them; so he went and signed Joliff again; that that was the only way he could get any satisfaction through the Department, to sign Joliff, and he did so.”
The claimant has attempted to prove that Indian depredations, freshets, and the severity of the winter were insurmountable obstacles to the carrying of the mail seven times a week *361 between Olden and Martinsdale, and rendered a daily service over that section of the route an impossibility. It seems plain that if it was possible to carry the mail over the road once a week, it must have been equally possible, if seven times the carrying force had been employed, to have carried it seven times a week. But, be that as it may, the court is of the opinion that a contractor who accepted pay for carrying the mail a designated number of times, concealing the fact that he was not doing so, is estopped from saying that performance was an impossibility.
The Postmaster-General, in this case, imposed a fine of double the contract price of the unperformed service. The court deems his action to have been fully justified by the facts; but the amount of the fine, $13,301.83, exceeded the amount of money due to the claimant upon his contract, and the Postmaster-General charged $920.47 of the deficiency to the claimant upon another and distinct contract. In the opinion of the court that was not a deduction within the intent of the statute, and for that amount the claimant is entitled to recover.
5. The statutes regulating the postal service also authorize the Postmaster-General to expedite mail transportation, but provide that the additional compensation “ shall bear no greater proportion to the additional stock and carriers necessarily employed than the compensation in the original contract bears to the stock and carriers necessarily employed in its execution.” (Rev. Stat., § 3961.)
In 1878 the claimant held a contract for carrying the mails “from Carson City, Nevada, by Genoa, Walker River, Pine Grove, and Sweet Water, to Aurora and return.” The time prescribed vas twenty-four hours, and the form of the schedule was, “ Leave Carson City daily 9:30 a. m.; arrive at Aurora next day 9:30 a. in.” In October of that year the Department prescribed a schedule of arrivals and departures for carrying the mail between Carson City and Genoa, which practically made that a side service. It was performed by one man and two horses, and it practically shortened the main route four miles. In December of the same year the Department ordered, without referring to the side service, that the service under the contract be expedited so as to reduce the time from twenty-four hours to eighteen. The contract price for the transportation of the mail in twenty-four hours was $7,340; the price allowed for the expedited service was $17,879.49.
*362 At the time when this order of expedition was made the claimant was carrying the mail in six-horse coaches from Carson City to Aurora over what may be termed the direct route, a distance of only ninety-six miles, in eighteen hours. The mail was being carried to Genoa by a side service ordered by the Department, as before stated, which shortened the route four miles; and was being carried to Pine Grove by another side service which the claimant had established on his own responsibility, and which shortened the direct route twenty miles more. This last service was performed by a man on horseback. The contract route was 120 miles, and the contract designated Genoa and Pine Grove as stations upon the route, and the Department probably supposed, when entering into the contract, that the road between Carson City and Aurora ran through those two places. As a matter of fact they were not on the direct route, and Pine Grove, indeed, was ten miles distant from it, a mining village, approached by a single road; so that if the claimant’s coaches had gone there it would have been practically a deflection from the direct line of travel of twenty miles, and they would have gone backward and forward over the same ground.
After this expedited service had gone on in this way for some time the Postmaster-General made some discoveries which led to the couclusion.that the amount allowed had been excessive, and he thereupon reduced it from $10,539.49 to $2,107.89, and furthermore, made this reduction retroactive, by ordering a reclamation of $20,039.57 for service already performed, which he deducted in part from moneys due to the claimant for services rendered under other contracts. The claimant now seeks to recover all of the money withheld, and the defendants maintain that the allowance of $10,539.49 a year for expedition was procured by false and ffadulent representations, and that all of it should be recovered back.
Those representations were that the expedited service would require fifteen men and eighty horses. It did require fourteen men and ninety horses. So far, therefore, the evidence of fraudulent representation fails.
It is insisted, however, by the counsel for the Government that the claimant at the same time represented that the unex-pedited service required only seven men and thirty-two horses, and the difference between these numbers and that of the ex *363 pedited service, which was only one-third of a mile per hour on the main line, was on its face preposterous and grossly excessive. The difference between the outlay in expense and the gain in expedition does indeed seem great if not disproportionate ; but it was as plainly before the Postmaster-General when he ordered the expedition,as before the court, and the fact complained of now was an equally apparent fact then. But questions still remain which go to the right of the claimant to recover.
There are two constructions which may be given to this expedition contract.
First, the original contract required performance in twenty-four hours on a route of 120 miles, being at the average rate of five miles an hour. The expedition to eighteen hours, may be considered as an increase of speed on every part of the route to 6§ miles an hour. This construction would have allowed the claimant to carry the mail under the original contract from Carson City to Aurora on the direct route of ninety-six miles at the rate of five miles an hour, i. e., in nineteen hours and twelve minutes, and would have' required him to carry it at the expedited rate of 6| miles an hour, i. e., in fourteen hours and twenty minutes. This is the construction given to the contract by the Post Office Department, the basis upon which the Postmaster-General disallowed the compensation of $10,639.49 and allowed $2,107.89. That is to say, he allowed the contract for expedition to stand, but charged the claimant for nonperformance, the only difference between this and an ordinary case of nonperformance being that the charge was not made until after the accounts had been allowed, adjusted, and paid, but was justifiable on the ground that the payments had been made in mistake of fact.
The second construction that may be given to the contract is that the original agreement did not contemplate a rate of travel, but simply required the contractor to serve all the post-offices on his route within twenty-four hours, leaving him at liberty to serve the side stations by a side service, and then to carry the mail over the direct route of ninety-six miles in twenty-four hours, being at the rate of four miles an hour. This is the construction given to it by the claimant.
If it be assumed that his construction of the contract is the proper one, it does not follow that he will be entitled to the damages he seeks.
*364 The statute which regulates this expedited mail service was just as obligatory upon the one contracting party as upon the other. It limited the authority of the Postmaster-General, and it notified the contractor of the limitation. He was not bound to furnish the Postmaster-General with information, but if he did, he was bound to furnish information which would not mislead. In the case of Griffith (22 C. Cls. R., 165) the contractor furnished statements as to the circumstances which existed and as to those which it was supposed might come to pass as to the force actually employed in an existing service and as to the force which would probably be required for an expedited service. The latter statements were necessarily conjectural, and the Postmaster-General knew that they were conjectural, no matter how well they might be fortified by affidavits, and he could exercise his own judgment in drawing a modified conclusion. If the present claimant had reduced thé time of the service on the direct route to four miles an hour, and then had informed the Postmaster-General of the force actually employed; or, if he had notified the Postmaster-General that he intended to reduce the running timé to four miles an hour, and that the averment of seven men and thirty-two horses was conjectural, and based on a running time of four miles an hour, there would have been no justifiable misapprehension on the partof thePostmaster-General. But as a matter of fact the phrase “ the route from Carson City to Aurora,” as used by the claimant, meant different things at different times. When he was seeking to expedite the service, it meant the direct route of ninety-six miles; when he was seeking pay for the service, it meant the entire route of one hundred and twenty miles.
There are, moreover, several solid grounds for a distinction to be drawn between this case and Griffith’s. In the first place, the claimant there proved and the court found that the number of carriers and horses estimated to be necessary was “actually used,” and that the number given by the contractor as the basis for ihe estimate was substantially correct (findings viii, ix, p. 173). Here the claimant has not shown what was done or what might have been done, and has not disclosed the data on which his representation of seven men and thirty-two horses was made. In the second place, the court found that “ the price fixed in the orders was reasonable for the service per *365 formed,” “ and was not an excessive price for carrying the mail” (finding vii, p. 173). Here there is no evidence whatever of the reasonable value of the service, and so far as the facts are disclosed the increase of price was grossly disproportionate to the increase of force. In the third place, it was shown that the claimant performed his service “ well and satisfactorily,” that inspectors passed frequently over the route, and that the Department was duly informed of the manner in which the service was performed (findings vii, x, pp. 173, 174). Here the claimant did not perform the service satisfactorily, and the Department was not duly informed of the manner in which it was performed; and it is manifest that the confusing element of the side service misled the Department, it being supposed that the actual route which had been expedited ran through Pine Grove, and that that post-office was directly included in its benefits. In the fourth place, the Post-Office Department never repudiated the transaction in the former case, though by a suspension of payment it practically compelled the contractor to bring it to the test and vindication of a judicial investigation. Here the Department has expressly repudiated it, and by one order has indicated that its payments were made in mistake of fact, and by another that it was imposed on by false and fraudulent representations. In the fifth place, it appeared that the Department “ knew what was being done” by the contractor, and after knowledge of the alleged mistake or fraud “ allowed him to go on,” thereby waiving the objection which it might have raised as conclusively “ as if no mistake or fraud had occurred ” (p. 194). Here it appears that on the instant that the Department discovered the real facts of the case the expedition was rescinded, the transaction disavowed, and the contractor charged with the overpayments which in mistake of fact had been made to him'.
These Post-Office orders expressing the compensation of an expedited mail service may be express agreements when accepted and acted upon, and yet be without the sanctity of an ordinary contract. The public officer who is clothed with legal discretion to purchase supplies or hire laborers binds the Government by his agreements, and assures the other contracting party of a compensation upon which he may rely. But behind these Post-Office orders there is always the statute, which in the most positive terms declares that ‘‘no extra allowance shall *366 be made for any increase of expedition,” ‘‘unless thereby the employment of additional stock and carriers is made necessary,” and then “shall bear no greater proportion to the additional stock and carriers necessarily employed than the compensation in the original contract bears to the stock and carriers necessarily employed in its execution.” In the case of an ordinary contract, a statute may be for the guidance of the Government’s agents, and therefore merely directory; in the case of the expedited mail service it is for a restraint on both of the contracting parties, and is therefore mandatory. In the case of an ordinary contractor, he can say that he parted with his property on the faith of the stipulated price; in the case of these mail carriers*, they can not say that they rendered a service on the faith of a stipulated compensation which was forbidden by law. The price named in the order of expedition merely assures the contractor that his compensation shall not 'be less than.the statute allows. If it appears on the face of the transaction that the compensation allowed is in excess of the statutory rate, the action of the Postmaster-General is ultra vires, and the order is to that extent void. If it appears by the evidence that the compensation is grossly or materially, in excess of the statutory rates, it must be held that the contract of expedition was made in mutual mistake of fact, and to that extent must be reformed. ■
Neither can the case derive support from the law of agency. If a plaintiff were to come into a court alleging that the defendant had executed a power of attorney to A. B., authorizing and empowering him to purchase goods of a certain kind and quality at a prescribed price, and that he, the plaintiff, relying thereon, had sold and delivered goods to the said A. B., he would also have to allege and prove that the goods so sold conformed in kind, quality, and price to the conditions of the power. But if he should come into court alleging, not that the goods complied with the conditions, but that before delivery he and the agent entered into an express agreement to the effect that the goods about to be delivered should be taken and accepted as of the right kind and quality and within the prescribed price and that he delivered them upon the faith of such agreement, his declaration would be strictly analogous to what is set up here, and would be bad.
In these Post-Office cases the order of the Postmaster-Gen *367 eral is received as evidence of tbe value of the service so long as it stands as the act of the Department, and to that extent the contractor is better off than if his suit were against another principal; but when it has been vacated and set aside by the same authority which made it for good cause, that is to say, not as having been made in error of judgment, but as having been procured by fraud or made in mistake of fact, the contractor must allege and prove his case, viz, that the value of the service which he rendered for the principal did not exceed the authority of the public agent.
The conclusion of the court upon this part of the case is that where the Postmaster-General in mistake of fact or through fraudulent representations fixed a price in an order for the expediting of a mail service, and on the discovery of the mistake or fraud rescinds the order and disavows the transaction, the contractor can not rely upon the order to establish the amount of his compensation, but must show by ordinary evidence the extent of the “additional stock and carriers” made necessary by the expedition of the service.
6. The contract for the foregoing route also provides that u in case of decrease, curtailment, or discontinuance of service, as a full indemnity to said contractor, one month’s extra pay on the amount of service dispensed with” shall be allowed. The order before quoted dispensed with the expedited service, and the claimant seeks to recover one months’ pay, amounting to $878.30, based upon the amount of $10,539.49 originally allowed for expedition. The defendants maintain that the contractor should recover nothing, because the order of expedition was procured by fraud, and if anything, only $175.65, the 'twelfth part of $2,107.65, the amount finally allowed for expedition.
Under the principles before stated in this opinion it must be held that the claimant is entitled to recover. It appears affirmatively that he was put to some extra cost in the side service to Genoa, and it is conceded that he did expedite the rate of travel in a slight degree upon the main route; and it is undeniable that the Postmaster-General, when all of the facts now established were known to him. adjudged the actual expedition to be worth $2,107.65, and credited the claimant at that rate. It can not be said, therefore, that this allowance was procured by fraud or made in mistake, and in the absence of fraud or *368 mistake it is questionable, under the decision of the Supreme Court in Altman’s Case (131 U. S. R., 31), whether it can be reviewed in the courts; but if it can be attacked on the ground that it was in fact ultra vires, as being beyond the limited compensation of the statute, most assuredly the burden of proof is on the defendants to establish the mistake, and to establish it by proof so clear and satisfactory as to leave no reasonable doubt. This has not been done, and the court must leave the Postmaster-General’s estimate undisturbed. But at the same time it is equally manifest that the claimant, who has produced no evidence to show what was the proportionate increase of “ stock and carriers ” rendered necessary by the expedition of the service, must likewise abide by the estimate of the Postmaster-General, and recover only at the reduced rate of compensation.
There are three decisions of the Supreme Court which have been adverted to in the course of the argument as bearing favorably and unfavorably upon the claimant’s case: Altman v. The United States; The United States v. Barlow; The Same v. Voorhees (131 U. S. R., 31; 132 id., 271; 135 id., 550). The first decides that the action of the Postmaster-General in the matter of fines and deductions for nonperformance can not be reviewed in the courts; the second, that where the Postmaster-General, in expediting a service, exceeded the statutory limitation through fraudulent misrepresentation or in mistake of fact, the excess can be recovered back in a suit at law under section 4057 of the Revised Statutes; the third, that where a contractor has voluntarily expedited a mail service, it is not fraud per se for him to represent what stock and carriers will be required under the one schedule and what under the other, without averring the fact that he has already voluntarily expedited the service by carrying the mail at the desired rate of speed. Those decisions bear upon different points in the present case, and so far as they are applicable the court has given full effect to them.
7. When the claimant brought this action, he set up in his petition only the two contracts which are the real subjects of controversy and alleged an unpaid indebtedness upon them. Before going to trial it was discovered or apprehended that the greater part of the alleged indebtedness was for moneys withheld from other contracts, not a subject of controversy, in order that the Department might practically enforce the fines, de *369 ductions, and reclamations which it had asserted in regard to the Montana and Nevada routes. The claimant then filed an amended petition, setting up these five additional contracts, and alleging unpaid and unconverted balances upon them. To this amended petition the counsel for the defendants objects that the causes of action growing out of the five contracts were barred when the amendment was made by the statute of limitations. If the amendment ha=l been incorporated in the original petition the action on those five contracts would have been brought in due time, but during the pendency of the suit the six years’ period of limitation has elapsed.
The principle which governs the introduction of new matter by amendment when the statute of limitations would bar a new action may be thus stated:
In an action of assumpsit at common law it is sufficient for the plaintiff to allege in his declaration, if the contract be an executed one, that he rendered certain- work and service for the defendant at his request, for which there remains a balance due, and he then may give his express agreement, if he have one, in evidence under the common counts. In the present case the claimant brought his action for mail transportation services rendered to the Government at its request, substantially, for an amount more than sufficient to cover the aggregate of balances of all the contracts, and alleged that each was executed. Where a petition is sufficiently broad to bring all the causes of action upon which the claimant relies before a court of the common law, it is sufficient to take the case out of the operation of the statute of limitations and bring it within the operation of the statute of jeofails-Judiciary Act, 1789 (1 Stat. L., 73, § 32).
The judgment of the court is that the claimant recover the sum of $1,105.12, and that the counterclaim of the defendants be dismissed.