## MILLER v. UNITED STATES.

APPEAL FROM THE COURT OF CLAIMS.

No. 178.   Argued January 19, 20, 1914.—Decided April 6, 1914.

The postal contract involved in this action conferred authority on the United States to discontinue its performance and gave the Post Office authorities power after the discontinuance to deal with the mail routes which the contract previously embraced in such manner as was found necessary to subserve the public interest.

The averments of the bill did not show such a state of facts as would justify the conclusion that the action of the Post Office authorities in exerting the lawful power of discontinuance was so impelled by bad faith as to cause the exertion of the otherwise lawful power to be invalid and void.

In determining rights thereunder, this court must be governed by the contract, and cannot first destroy it in part and then enforce that which remains.

The difficulties in performing a postal contract are presumably in the minds of the contracting parties, and the Government cannot be deprived of the protection of the reserved powers of cancellation in case of the failure of the contractor to perform by reason of such difficulties.

Where the hardships endured by a postal route contractor are the re-
sults of his own mistake in making an improvident contract, relief
can only be obtained at the hands of Congress. .
47 Ct. Cl. 146, affirmed.

THE facts, which involve the authority of the Post-
master General to cancel postal contracts and the rights
of a contractor for a mail route in Alaska in that respect,
are stated in the opinion.

*Mr. Louis T. Michener*, with whom *Mr. Perry G.
Michener* was on the brief, for appellant:

In the construction of the contract, or any particular
clause or part of it, the court is to examine the entire
contract, consider the relations of the parties, their con-
nection with the subject-matter, the circumstances under
which it was signed, the state of things existing at the
time it was made, the nature of the obligations between
the parties, and is to look carefully to the substance of
the agreement as contra-distinguished from its mere form,
in order to give it a fair and just construction, and ascer-
tain the substantial intent of the parties. *Canal Co. v.
Hill*, 15 Wall. 94, 99–101; *Rock Island Ry.* v. *Rio Grande
R. R. Co.*, 143 U. S. 596, 609; *Winona Land Co.* v. *Min-
nesota*, 159 U. S. 526, 531; *United States* v. *Utah &c. Stage
Co.*, 199 U. S. 414, 423.

The discontinuance stipulation should be so construed
as not to apply to a case in which the payment of one
month's extra pay would be grossly inadequate as in-
demnity or compensation to the contractor. *United
States* v. *Utah &c. Stage Co.*, 199 U. S. 414; *Serralles'
Succession* v. *Esbri*, 200 U. S. 103, 113; *Schuylkill Nav.
Co.* v. *Moore*, 2 Whart. 491.

A stipulation could be so written as to be a complete
and lawful ascertainment and liquidation of damages.
*Sun Printing & Pub. Assn.* v. *Moore*, 183 U. S. 642.

This contract is not to be so construed as to give the

officer the power to do arbitrary, capricious, oppressive, or unreasonable things, to the cost or damage of the contractor, for it is implied that the officer will do nothing of the kind. *United States* v. *N. A. Com. Co.*, 74 Fed. Rep. 145, 149; *Lewman's Case*, 41 Ct. Cls. 470, 478; *Ripley* v. *United States*, 223 U. S. 695, 701; *Griffith's Case*, 22 Ct. Cls. 165, 193; *C., M. & St. P. Ry. Co.* v. *Hoyt*, 149 U. S. 1, 15. And see *Slavens* v. *United States*, 196 U. S. 229, distinguished.

The contractor was entitled to fair play, and the officer could have given it to him, for there was neither law nor contract to forbid. *Garfielde* v. *United States*, 93 U. S. 242, distinguished as turning on the power of the Postmaster General to discontinue the service under the regulations, and this court holding that he had that power.

The long existing regulations are of importance here because their substance was incorporated in the contract.

"Annul" and "discontinue" are not equivalent or synonymous terms.

The damages here include loss of profits and loss of property. A contractor may recover the amount of profits lost. *Hinckley* v. *Pittsburgh Steel Co.*, 121 U. S. 264, 275; *Anvil Min. Co.* v. *Humble*, 153 U. S. 540, 549; *Boehm* v. *Horst*, 178 U. S. 1, 15.

An injured contractor is entitled to be made whole. In the application of this rule, damages are allowed for his personal property lost. *Figh's Case*, 8 Ct. Cls. 319, 324, 325; *Roetinger's Case*, 26 Ct. Cls. 391, 398, 408.

On the state of facts in this case appellant had the legal right, indeed it was his legal duty, to perform the contract, and upon such performance he became entitled to recover in his own name for the losses and damages incurred. *United States* v. *Hitchcock*, 164 U. S. 227; *United States* v. *Behan*, 110 U. S. 338; *Salisbury* v. *United States*, 28 Ct. Cls. 52.

It was not necessary to charge the Postmaster General

with bad faith in order to state a cause of action. If the Postmaster General acted beyond his rights and powers under the contract and the law, and damages resulted therefrom to the appellant, the right of action exists, and this is true no matter what the motives of the official may have been. *Robertson* v. *Frank Bros. Co.*, 132 U. S. 17, 24; *Lewis* v. *Chicago &c. R. R.*, 49 Fed. Rep. 708; *Lyons* v. *United States*, 30 Ct. Cls. 352, 365.

The averments in the petition concerning expenditures, values, and damages are sufficient. They are in harmony with 2 Chitty on Plead., 16th Am. ed., 37, 38. See *District of Columbia* v. *Barnes*, 197 U. S. 146, 154, citing *United States* v. *Burns*, 12 Wall. 246, 254; *United States* v. *Behan*, 110 U. S. 338, 347.

In proving damages it will be necessary for claimant to comply strictly with the rules of evidence, and it will be incumbent on the court below to make clear and specific findings on the subject. Should it be found desirable the Government may file a motion to make the petition more specific. The demurrer cannot be made to take the place of such a motion.

*Mr. Assistant Attorney General Thompson* for the United States:

The terms of the contract gave the Postmaster General authority to terminate it.

The regulations of the Post Office Department applying to this route gave the Postmaster General authority to discontinue the contract.

The petition does not allege facts upon which damages may be assessed.

In support of these contentions, see *Garfielde* v. *United States*, 93 U. S. 242; *Gleason* v. *United States*, 175 U. S. 588; *Kihlberg* v. *United States*, 97 U. S. 398; *Lord* v. *Pomona Land Co.*, 153 U. S. 576; *McLaughlin* v. *United States*, 37 Ct. Cls. 150; *Railroad Co.* v. *March*, 114 U. S. 549;

*Railroad Co.* v. *Price*, 138 U. S. 185; *Slavens* v. *United States*, 196 U. S. 229; *United States* v. *Behan*, 110 U. S. 338; *United States* v. *Utah &c. Stage Co.*, 199 U. S. 414; *Wreford* v. *United States*, 32 Ct. Cls. 415; Postal Laws and Regulations, §§ 817, 1261; Rev. Stat., § 1277.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

The petition claimed $51,736.00 because of an alleged violation of a contract to carry the mails over a mentioned route in Alaska. The United States demurred on the ground that no cause of action was stated; and the court having sustained the demurrer and dismissed the petition, 47 Ct. Cl. 146, the case is here. The text of the petition therefore is the matter we are called upon to consider. It covers sixteen pages of the printed record. We shall seek to rearrange its contents so as to enable us with accuracy and yet with brevity to state the substance of the petition in order to determine whether a cause of action was stated.

It was alleged that on September 15, 1905, the United States advertised for proposals to carry the mails over a route in Alaska from Valdez to Eagle, a distance of 428 miles, and back. The advertisement conveyed information concerning the route and the duty which would rest upon the contractor, and contained the following:

"The Postmaster General may order an increase of service on a route by allowing therefor not to exceed a pro rata increase on the contract pay. He may change schedules of departures and arrivals in all cases, and particularly to make them conform to connections with railroads, without increase of pay, provided the running time be not abridged. The Postmaster General may also discontinue, change, or curtail the service in order to place on the route superior service, or whenever the public

interest, in his judgment, shall require such discontinuance, change, or curtailment for any other cause, he allowing as full indemnity to contractor one month's extra pay on the amount of service dispensed with, and not to exceed pro rata compensation for the amount of service retained and continued; but the Postmaster General reserves the right to rescind any acceptance of a proposal at any time before the signing on behalf of the United States of the formal contract, without the allowance of any indemnity to the accepted bidder."

Under this proposal the bid of John B. Crittenden to do the called for work at $46,000.00 per annum was accepted, and on the first of February, 1906, a contract was entered into between the Government and Crittenden and his sureties, John Miller and Charles H. Cramer, for performing the service for the sum of the bid for the period of four years from the first of July, 1906 to June 30, 1910. The written contract contained specifications as to the character of the work, its requirements and the mode of its performance which it is not here necessary to detail. Besides a full stipulation giving the Postmaster General authority to enforce the contract and all its provisions by imposing penalties and forfeitures and by discontinuing the contract in case of non-performance, as embodied by the provisions which are reproduced in the margin,[1] the contract contained the following:

---

[1] And it is hereby further stipulated and agreed by the said contractor and his sureties that the Postmaster General may annul the contract or impose forfeitures in his discretion for repeated failures or for failure to perform service according to contract; for violating the postal laws or regulations; for disobeying the instructions of the Post Office Department; for refusing to discharge a carrier, or any other person having charge of the mail by the contractor's direction, when required by the Department; for subletting service without the consent of the Postmaster General, or assigning or transferring this contract; for combining to prevent others from bidding for the performance of postal service; for transmitting commercial intelligence or matter

"It is hereby stipulated and agreed by the said contractor and his sureties that the Postmaster General may discontinue or extend this contract, change the schedule and termini of the route, and alter, increase, decrease, or extend the service, in accordance with law, by allowing not to exceed a pro rata increase of compensation for any additional service thereby required; and, in case of decrease, curtailment, or discontinuance of service, as a full indemnity to said contractor, one month's extra pay on the amount of service dispensed with, and not to exceed a pro rata compensation for the service retained; but no increase of compensation shall be allowed for a change of service not amounting to an increase, nor indemnity of month's extra pay for any change of service not involving a decrease of service."

In addition the statutory provisions governing the subject and the Post Office regulations having the force of law which had been stated in the advertisement for proposals were by reference incorporated and made a part of the contract by the following provision:

"That this contract is further to be subject to all the conditions imposed by law, and by the several acts of Congress relating to post offices and post roads, and to the conditions stated in the pamphlet advertisement of September 15, 1905."

It was averred that shortly after the making of the contract Miller, the petitioner, who was one of the sureties of

which should go by mail, contrary to the stipulations herein; for transporting persons so engaged as aforesaid; or for the failure of the contractor to give his personal supervision to the performance of the service, and to reside upon or contiguous to the route; that the Postmaster General may annul the contract, whenever the contractor shall become a postmaster, assistant Postmaster, or member of Congress, or otherwise legally incompetent to be concerned in such contract: and whenever, in the opinion of the Postmaster General, the service can not be safely continued, the revenues collected, or the laws maintained on the road or roads herein.

Crittenden, found that he was not able to supply the capital needed for the performance of the contract and therefore he, Miller, as surety, was obliged to and did expend the moneys needed to buy "harness, sleds, horse feed, horses and dogs to carry the mails" under the contract, so that by the first of July, 1906, the contractor was ready to perform and did commence the performance of his duties under the contract and continued to perform them until the time when subsequently the contract was discontinued by the Postmaster General. It was averred that after thus advancing the money as surety of Crittenden, Miller, finding that further advances were necessary to enable Crittenden to go on with his work, formed a partnership with him and under this partnership advanced large sums of money to meet the heavy expenses which were required, and continued to do so, during a period of nearly two years, that is up to or on or about the first of May, 1908, when he was compelled, in order to protect himself, and the United States, to take a transfer of the contract from Crittenden, that is, to become the sub-lessee of the contract, his written agreement dated the first of May, 1908, with Crittenden to that effect having been approved by the Post Office authorities, indeed it was alleged that such agreement was written by those authorities. This sub-letting contract which was set out in full in the petition bound Miller, the subcontractor, by all the obligations of the original contract, made him liable for all fines, forfeitures, etc., imposed under the original contract, and expressly subjected him to the risk of the power to change, increase, modify or discontinue the service as provided in the original contract, the clauses covering these two latter subjects being in the margin.[1]

---

[1] And it is hereby further agreed that liability for all fines and deductions imposed upon a party of the first part by the Postmaster General, for failures and delinquencies in the performance of service under his contract shall be assumed and borne by the party of the second part,

It was alleged that the petitioner as subcontractor performed the contract as long as he was permitted to do so by the United States; that on August 11, 1908, the Postmaster General issued an order discontinuing the contract service over the route which the contract embraced, to take effect on September 30, 1908, and this order was enforced at the time mentioned and an indemnity allowance of pay for one month only was made the contractor. The petition alleged that for many years "the regulations adopted and enforced by the Post Office Department have authorized the Postmaster General to discontinue or curtail the service, in whole or in part, in order to secure 'a better degree of service' or 'superior service,' or whenever the public interest, in his judgment, should require such discontinuance or curtailment for any other cause; he allowing, as a full indemnity to the contractor, one month's extra pay on the amount of service dispensed with, and pro rata compensation for the amount of service retained and continued." The continuance of this regulation was alleged and the various changes in the mere form in which it was expressed up to and including the time when the regulation then existing found statement in the contract and in the proposals subject to which, as we have seen, the contract was made. The petition however averred as follows:

---

and, if necessary, the Auditor for the Post Office Department may enforce this agreement by proper deductions from any compensation due the party of the second part for service performed under this subcontract.

And it is hereby further agreed that for any additional service required by the Postmaster General, and not hereinbefore expressly stipulated, the party of the second part shall be allowed not to exceed a pro rata increase of compensation; and, in case of decrease, curtailment, or discontinuance of service, as full indemnity, a pro rata of the one month's extra pay allowed by the United States to the party of the first part, and, unless previously herein stipulated, not to exceed a pro rata compensation for the service retained.

"The regulation, whatever its language or its number, was not drawn and promulgated with reference to the conditions existing in Alaska on Route No. 78108 during the period covered by the contract sued on, but it was drawn and promulgated with reference to conditions existing within the limits of the United States and exclusive of that route in Alaska, and particularly without reference to the hereafter described conditions existing in that part of Alaska covered by the contract sued on.

"In the preparation of the forms of advertisement, proposal and contract in suit, the government officials adopted the regulation in force, and such advertisement, proposal and contract were drawn and printed for general use, and the proposal and contract were presented for execution, without particular regard to the physical, climatic, or other conditions then existing or that might exist along the line of that route during the contract period of four years. At the execution of the proposal and contract, and of the subsequent contract of subletting, Crittenden and petitioner did not think or believe that the contract in suit would be discontinued or terminated in any manner or form, but on the contrary, they believed that the contract in suit would be in full force and effect during the whole contract period, and they named the amount of annual compensation in that belief. They expected that they would encounter losses of profits in a portion of the contract period, but would earn good profits before the contract period ended and for the whole contract period. Had Crittenden and the petitioner believed otherwise than as above stated, they would not have executed either of the contracts for that annual compensation, nor would petitioner have made the arrangements and expenditures in the early part of *1903*, [1908] hereinafter described. On the contrary, petitioner made such arrangements and expenditures in the belief that the contract would be in force for the full contract period. Peti-

tioner avers that if the government had asked bids for a two year contract on that route Crittenden would not have submitted a bid at all, and petitioner would not have become surety on any contract for less than $92,000 per annum, because the conditions were such that the expenses of carrying the mails on the route would be far heavier for carrying them in 1906 than in 1907, and in 1907 than in 1908, and in 1908 than in 1909. As an illustration, the petitioner avers that it cost, to-wit: $151,169.55 to perform the contract until it was discontinued by order of the Postmaster General, that amount being to-wit: $48,595.08 more than the total sum received from the government, but it would only have cost him, to wit: $43,390 to perform the contract for the remaining twenty-two months of the contract period, during which time he would have received, to-wit: $84,326.00 for carrying the mails, a profit of, to wit: $40,936.''

The petition moreover alleged that the conditions which existed at the time the contract was made in the region covered by the mail route which it embraced, caused it to be extremely difficult and hazardous to human life and property to carry the mails over the route described and within the time specified in the contract. In many places it was averred, the government trails were not fit to be used because of their bad condition, and it became necessary to build new ones. With much amplitude, the petition described the almost insurmountable difficulties with which the performance of the contract was environed: the cutting of trails, the building or repairing of bridges, the erecting of sheds, the transporting at an enormous expense along the route of the means to sustain men and horses, the struggle in doing so in winter through ice and snow, and in spring and summer, the overcoming of obstacles resulting from flood and many other causes. Indeed, the facts detailed, being taken as true, establish that the performance of the contract was surrounded by difficulty of the

gravest character to overcome which called for the manifestation on the part of the contractor of courage, the exertion of great energy and a willingness to make sacrifices in order to discharge the duties imposed by the contract. It was alleged that the making of the strenuous exertion and the incurring of the hazards to life and property which, as we have stated, the petition described, were necessary "as the Government did not make allowance for delays, whether caused by snows, storms, blizzards, the freeze-up in the Fall, the break-up in the Spring, or any other consideration, but fines were charged at every opportunity."

It was alleged that counting on the fact that the contract would be allowed to go to its termination, after the petitioner became the sub-lessee he spent a large amount of money in putting the route in fair condition, in provisioning the same by shipping food for men and horses at freight rates which were enormous, all of which he would not have done had he been informed of the intention of the Government to discontinue the contract before the end of the contract period. That upon the same reliance, as a means of utilizing his equipment, he bought out the rights and assumed the obligations of a contract which had been made by a firm known as Scott & Frase for carrying the mails from a point known as Tanana Crossing to Eagle, the place where the contract of which the petitioner was the sub-contractor terminated.

It was alleged that although in September, 1908, the Government discontinued the contract of petitioner, it did not discontinue the mail service, to which that contract related, but only restricted it, that is cut out about 190 of the 428 miles between Valdez and Eagle and in the balance had the mails carried by contracts exacting a less onerous and less frequent service, these contracts having been made as emergency contracts, without advertisement, without affording the petitioner any opportunity to bid

for them or to take them under the prior contract which was discontinued by the order of 1908. The sum which was claimed was the alleged loss resulting from having been obliged to discontinue the contract, the calculation in effect on the subject charging the amount spent under the contract as well as $41,129.52 as the result of the purchase of the Scott & Frase contract, and crediting the total amount received from the Government.

These being the averments of the petition, it is obvious, the questions are as follows: First, did the contract confer the authority on the United States to discontinue its performance, and, if so, did it give power to the Post Office authorities after the contract was discontinued to deal with the mail routes which the contract had previously embraced in such a manner as was found necessary to subserve the public interest; second, if yes, did the averments of the bill show such a state of facts as would justify the conclusion that the action of the Post Office authorities in exerting the lawful power of discontinuance was so impelled by bad faith as to cause the exertion of the otherwise lawful power to be invalid and void?

That in explicit terms the express authority was given to the United States to discontinue the execution of the contract is so plainly the result of the proposal which led up to the contract, of the text of the contract itself, of the Post Office rules and regulations which by the text were incorporated in and made a part of the contract, as to leave no room for discussion. Indeed this result was in terms admitted by the allegations of the petition to which we have referred, and the challenge of the power to discontinue therein made, conceded that the terms of the contract gave the power, but relied only upon the assertion that such terms, although express and positive, should be read out of the contract as inapplicable to the situation to which the contract related, that is, the carriage of the mail over the designated route in Alaska.

But we must be governed by the contract and cannot, as we are asked to do, first destroy it in part and then enforce that which would remain, which would be the result of holding that the stipulations of the contract conferring power upon the Government may be obliterated and the contract with those stipulations wiped out be enforced as against the Government for the benefit of the petitioner. And the absolutely conclusive force of this view, when considered as a general proposition, is at once additionally demonstrated by a particular consideration of the case in hand, since the reserve power on the part of the Government to discontinue the contract which is here in question, found its place in the proposal and contract in consequence of the postal regulations having the effect of law which had prevailed for many years and which therefore, caused the contract with the reservation of the right to discontinue to be but the expression of a rule of public policy limiting in the public interest the power to contract, a limitation sanctioned over and over again at least by an unerring implication by statutory approval. Of course under this condition of things, the suggestion that the contractor would not have bound himself to the Government if he had considered that the unambiguous words of the contract would be enforced can be of no avail. And it is equally manifest that it is impossible to give any effect to the suggestion that the terms of the contract did not apply because of the place where the work covered by the contract was to be performed. The presumption is that whatever may have been the difficulties of performance, they were in the minds of the contracting parties and were elements entering into the offer by the contractor to do the work for a stated compensation and also constituted elements of danger against which the Government protected itself by the express reservation of the right to discontinuance which was explicitly exerted. While it is not necessary to do so, we observe in passing that the aver-

ments of the petition itself give rise to inferences sustaining this very natural conclusion.

That the power to discontinue the contract left the Government free after such discontinuance to make such contracts as were deemed best, is also the unambiguous result of the proposals submitted by the Government, of the text of the contract itself, and of the context of the postal rules and regulations which by reference were incorporated into the contract. In fact, while the context establishes this result so clearly and so obviously as to leave no room for extraneous reasoning, if such were not the case, and purpose and intent required to be looked at, it is manifest that to deny that such power existed would be to set aside and frustrate the public policy upon which the right to discontinue rests. It would render the exertion of the power futile—or cause it to be inadequate to protect the public interest since it would deprive of means of remedying the evil to cure which the right to discontinue was exerted. The irresistible force of the contract itself on the subject has been previously pointed out by this court in a case which was cited by the court below in its clear opinion. *Slavens* v. *United States*, 196 U. S. 229, 233, 236.

Making the assumption for the sake of the argument only that the existence of a fraudulent motive or of bad faith impelling the exercise by the Postmaster General of the authority conferred upon him to discontinue, be a factor in determining whether an otherwise valid power had been lawfully exerted, such concession could have no possible reference to this case, since it is expressly conceded in the argument at bar that no such charge was made in the petition and none is relied upon, the only claim being that a power not conferred was exerted or that if one which was given was exercised, the circumstances disclosed were of such a character as to justify the legal conclusion that it was so grossly inequitable to bring

the power into play that its exertion ought not to receive judicial sanction. But this simply calls upon us to substitute judicial discretion for the discretion lodged by the law and the contract in the Postmaster General, a power which of course it is beyond our competency to exercise. Let it be conceded that if the truth be admitted of all the facts as to the unforeseen difficulties, the stress of storm and blizzard and snow and ice and freshet, which prevailed as averred over the trackless wilderness through which the mail route extended, a case of great hardship would be established, the very truth of the averments referred to also naturally suggests the reasons which in the exercise of a wise discretion may have called into play the exertion of the power to discontinue the contract in the public interest and for the public benefit. As under the conditions stated the hardships alleged were but the result of a mistake of the petitioner in making an improvident contract, relief can only be obtained at the hands of Congress.

*Affirmed.*