**Robert J. CORNELIUS, Sr.**

v.

**The UNITED STATES.**

No. 303-64.

United States Court of Claims.
July 16, 1965.

G. Clinton Fogwell, Jr., West Chester, Pa., attorney of record, for plaintiff. Reilly & Fogwell, West Chester, Pa., of counsel.

Isaac D. Benkin, with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

### PER CURIAM:

This case was referred pursuant to Rule 54(b) to Trial Commissioner Robert K. McConnaughey with directions to make his recommendation for conclusion of law on defendant's motion for summary judgment. The commissioner has done so in an opinion filed April 1, 1965, wherein he recommended that the defendant's said motion be granted and the petition dismissed. It appears to the court that plaintiff has failed to file a request for review by the court of the commissioner's recommendation for conclusion of law pursuant to the provisions of Rule 55(b) and that the time for so doing has expired. Since the court is in agreement with the opinion and recommendation of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is, therefore, not entitled to recover, defendant's motion for summary judgment is granted, and plaintiff's petition is dismissed.

### OPINION OF COMMISSIONER

This case is before the court on the defendant's Motion for Summary Judgment.

*Plaintiff's Prior Service*

The plaintiff is an individual. For 8 or 10 years before July 1963, he carried

mail by truck, pursuant to contracts with the Post Office Department. In 1961 his route was between Paoli, Pennsylvania, and Philadelphia, a distance of about 24 miles, and included stops at various intermediate points. His typical daily trip started at about 2:00 in the afternoon and ended about 4:30 the next morning. He owned the truck he used in serving his route.

### Renewal of the Plaintiff's Contract

On June 28, 1961, the arrangement then in effect was extended for a term of 4 years from July 1, 1961, by a new contract (hereafter called the contract).

Before he entered the contract, the plaintiff went to Washington, D. C., to confer with officials of the Post Office Department for the purpose of getting such assurance as he could that, if he entered the contract, it would remain effective throughout its full 4-year term and therefore would justify the purchase of a new truck he was then considering buying.

He was unable to confer with the Postmaster General, as he had hoped to do. Through discussion with an assistant to the Postmaster General, whom the record does not otherwise identify, he received the impression that he had no cause for concern that the contract would not remain effective for its full nominal term of 4 years.

On the basis of this impression, the plaintiff bought a new truck, in August 1962, especially constructed and equipped to perform the services required by the contract. After he acquired the new truck, he used it in performing the contract during the period it remained effective. The truck is not readily adaptable to other uses.

### The First Notice of Termination

By a letter dated April 8, 1963, the contracting officer notified the plaintiff that it would be necessary to "cancel" the contract, effective approximately June 30, 1963.

The letter stated that the Reading Railroad had asked to be relieved of carrying mail on its trains about July 1, 1963, that the request had been approved, and that the Post Office Department had made extensive plans to provide highway transportation service to post offices "in the area concerned." [1]

The letter went on to say that, to provide proper service, it would be necessary to revise existing highway patterns drastically in some sections, and, in some instances, to discontinue existing routes and advertise new routes for competitive bidding. The letter included an expression of appreciation for the plaintiff's services and a cordial, informal invitation to bid on the projected new routes.

### The Formal Order of Termination

The action ordering termination of the contract was taken May 10, 1963, through a formal contract route service order, signed by the contracting officer, which states—

Effective with the close of business June 29, 1963, discontinue route: allow contractor $\frac{1}{12}$ of annual compensation as indemnity.

*Note.* Route discontinued because of change in service requirements of area.

The order of May 10, 1963, indicates that the annual rate of pay under the contract was $16,616.77.

Indemnity equivalent to 1 month's compensation under the contract was tendered. The plaintiff accepted the in-

---

1. The reference in the letter to the termination of the Reading's service was inadvertent, and not directly pertinent to discontinuance of the plaintiff's route. The Reading did not serve any area immediately related to the area served by the plaintiff and cessation of the Reading's service alone would have had no direct effect on the service in that area.

The termination of the plaintiff's contract was part of a general rearrangement of the pattern of service to the suburban area surrounding Philadelphia for the purpose of accommodating the service to rapidly changing conditions and the availability of new facilities, most notably a new truck terminal in Philadelphia.

demnity under protest. He regarded it as merely a partial payment against the amount of compensation payable for the full 4-year term, all of which he claims he is entitled to receive. His petition asks for $14,612.

### Administrative Appeal and Suit

Promptly following his receipt of the April 8, 1963 notice of termination, the plaintiff appealed to the Post Office Department Board of Contract Appeals. Subsequently, the board heard evidence and denied the appeal.[2] This action followed.

### The Second Notice of Termination

On May 28, 1963, the contracting officer sent the plaintiff another letter which referred to the plaintiff's appeal of the earlier notification of "cancellation." This second letter reiterated the substance of the earlier letter's statement of reasons for termination of the contract in the following terms:

> Because of the discontinuance of the mail service by the Reading Railroad Company and the opening of our new truck terminal at Philadelphia, it is necessary to drastically revise our truck transportation in eastern Pennsylvania. To provide efficient integrated service in the suburban area west of Philadelphia, it was necessary to plan completely new service to meet current needs and operated by one contractor. This will eliminate the need for present service which is performed by Pennsylvania Railroad trucks, mail messengers, post office vehicles, and your star route.

> Since we will have no need for Star Route 41381 when the new service is activated, it will be necessary to cancel your contract.

The letter of May 28, 1963, concluded—

> This letter constitutes the final decision of the contracting officer. You will be advised further by the Board of Contract Appeals.

### The Route Changes and Reasons Therefor

The new routes established in 1961 did not include an exact replica of the route the plaintiff had served under the contract. They provided for service to the same terminal points, but did so as part of a route approximately twice as long, with stops at intermediate points, some of which differed from the stops on the old route. The new route was run at different times and the stops were in different sequence from those of the route served by the plaintiff under the contract. The new route was served by a tractor-trailer. The pattern of service for the area, generally, including service to the various points previously served by the plaintiff, bore little resemblance to the former general pattern.

There was substantial evidence before the board that the purpose of the new arrangements was to furnish mail service of equal quality, more efficiently, and that there were reasonable grounds for belief that they would accomplish that objective.

The plaintiff submitted a bid to serve one of the new routes but he was not the low bidder. He testified before the board that he could not provide the service for the compensation the new contractor was receiving.

2. The record of the plaintiff's appeal to the Post Office Department Board of Contract Appeals (Appeal No. P.O.D. BCA No. 94) is attached as an exhibit to the defendant's motion. The board denied the appeal on the merits. In a footnote to its decision, the board stated that if the termination had been a breach of the contract, as the plaintiff contended, the appeal would have to be dismissed for want of jurisdiction, because the board's jurisdiction extended only to disputes arising under the contract, whereas a breach would be a matter outside the contract. In support of the board's decision to deny the appeal on the merits rather than to dismiss it for lack of jurisdiction, the note concluded that the termination and the payment made to the plaintiff were consistent with the language of the contract and did not amount to a breach.

The board, on the basis of evidence before it, found that the route served under the contract and the route subsequently established are different, and that the discontinuance of the plaintiff's former route was required by the public interest.

█ To the extent these are determinations of fact within the competence of the board under the disputes clause of the contract, the record affords no basis for concluding that the board's decisions concerning them are fraudulent, capricious, arbitrary or so grossly erroneous as necessarily to imply bad faith, or that they are not supported by substantial evidence.

For this reason, and in view of the fact that, in its response to the defendant's motion, the plaintiff asserts no controversy with respect to the material facts, the question for determination here, as far as the board's decision is concerned, is whether that decision is correct as a matter of law.

### The Contract's Provisions for Termination

Section 10 of the contract is entitled *"Changes in Service and Schedule."* It provides that the contracting officer may order decreases, discontinuances, increases or other changes in the service, in the schedule, or in the route, in accordance with law, and provides for adjustments, according to specified standards, in the compensation payable in case of any such action.

It includes a provision that—

\* \* \* In case of decrease, curtailment, or discontinuance of service involving a reduction in compensation, the Contractor will be allowed as full indemnity 1 month's compensation on the amount of service dispensed with. \* \* \*

It also includes a provision that failure of the contractor and the contracting officer to agree upon the amount of the adjustment in compensation shall be deemed to be a dispute concerning a question of fact within the meaning of section 2 of the General Provisions of the contract.[3]

Section 16 of the contract is entitled, *"Cancellation."* It provides that the contracting officer, subject to appeal to the Postmaster General, may terminate the contractor's right to perform the contract for any of various stated reasons, all of which are based on unsatisfactory performance by the contractor.

In contrast to section 10, section 16 contains no provisions for indemnity of the contractor in case of cancellation pursuant to its terms. None of the stated reasons for cancellation under section 16 is applicable to the plaintiff's performance. The services he performed

---

3. Section 2, entitled *"Disputes,"* is a typical disputes clause.

The plaintiff does not question that the Post Office Department Board of Contract Appeals is the duly authorized representative of the Postmaster General for the hearing of appeals in case of disputes arising under the contract. Nor does he appear to question the finality or conclusiveness of the board's findings of fact.

In contending that the board was wrong in holding that the route he served under the contract was "discontinued," he does not quarrel with the fact, found by the board, that service to some of the points he had served is now provided by means of a tractor-trailer that covers a distance on each trip almost twice as long as his former route. Instead, he apparently contends that, inasmuch as

the points on his old route are still served, even though by a different kind of equipment, as part of a geographically longer trip in different sequence and at different times, the old route still exists as a matter of law.

Neither does the plaintiff appear to question the factual correctness or finality of the board's findings concerning the reasons for the changes in the pattern of service in the area. Instead, he questions (1) the legal authority of the contracting officer to terminate the contract for those reasons, and (2) whether, because the termination was referred to in the notice as a "cancellation," it did not amount to a breach of the contract in the absence of any of the grounds for cancellation specified in section 16 (see infra).

under the contract, and before, were always adequate and satisfactory.

Section 18, entitled *"Laws and Regulations Applicable,"* makes the contract and the service performed under it subject to laws applicable to the Post Office Department and regulations pursuant thereto.

### Postal Regulation Concerning Discontinuance of Service

Section 521.363(a), Chapter 5, of the Postal Manual (39 CFR § 94.3(f) (3) (1962)), provides as follows:

\* \* \* \* \* \*

*Changes in service.* (i) Transportation planning and procurement officers may at any time issue orders extending, increasing frequency, and changing the line of travel, by allowing a pro rata increase in compensation for any increased service required. They may also issue orders curtailing, reducing frequency, discontinuing, or changing line of travel by allowing 1 month's extra pay on the amount of service eliminated, and not exceeding pro rata compensation for the service retained.

In addition with respect to termination, regulations provide:

*Termination*—(1) *Time.* Star route contracts may be terminated at the end of any 4-year term at the option of the Postmaster General or the contractor or they may be terminated at any time as provided by law. 39 CFR § 94.3(i) (1962).[4]

4. There is found at the end of this last quoted paragraph, in parentheses, the reference "See paragraph (f) (3) (i) of this section."

5. This court, long ago, expressly recognized this policy, in Griffith v. United States, 22 Ct.Cl. 165, 192 (1887), appeal dismissed, 141 U.S. 212, 11 S.Ct. 1105, 35 L.Ed. 719 (1890), by the following statement:

[T]he law-making power intended to give to the Postmaster-General great

### Statute Concerning Discontinuance of Service

39 U.S.C. § 6106 (Supp. V, 1958), provides, in pertinent part, as follows:

The Postmaster General may discontinue service on a post road or part thereof when, in his opinion—

\* \* \* \* \* \*

(4) the public interest so requires.

### The Issues

The defendant's motion presents two questions:

1. Whether, in the circumstances of this case, the contracting officer had authority, under section 10 of the contract, to terminate the plaintiff's right to perform, before the expiration of the contract's nominal 4-year term, and

2. Whether, if he did, the action he took was an effective exercise of that authority, or an unjustifiable "cancellation," under section 16 of the contract.

The plaintiff's response to the motion actively presses only the second of these two issues. Nevertheless, because they are interrelated, it appears appropriate to dispose of both.

### Authority to Discontinue the Route

■ The statute and the regulations quoted above express a legislative and administrative purpose that officials responsible for management of the postal service shall have a broad, flexible, discretionary authority to discontinue mail routes when, in their judgment, the public interest requires that they be discontinued.[5]

power of discretion in the management of the mails and post-roads, and committed much to his opinion and good judgment. Such a policy is necessary, for no such service can be strictly mapped out and defined by statute, and its changing needs require the attenion of an executive officer vested with power of management.

There is nothing in the record to suggest that the underlying policy has changed in the intervening years.

Section 10 of the contract is designed to effectuate that purpose in the particular case of the service provided for by the contract, by creating a consensual authority in the contracting officer to discontinue the route whenever, in his judgment, the efficiency of the postal service would be improved by doing so.

According to section 10, the authority to discontinue service under the contract is subject only to conformity with the law and to the payment of indemnity equivalent to 1 month's compensation under the contract for the service discontinued.

■ The required indemnity was paid, and the record affords no basis for concluding that the discontinuance of the plaintiff's route was arbitrary or capricious, or that it could not be regarded as a justifiable part of a reasonable, general effort to promote the public interest by improving the efficiency of the postal service within the area west of Philadelphia. The action taken was plainly consistent with the legislative and administrative policy evident from the statute and the regulations and with the terms and purpose of the authority conferred on the contracting officer by section 10.

The courts have upheld discontinuance of postal routes where the justification for doing so was less clearly disclosed than the justification shown here and when the hardship was relatively more substantial.

In Miller v. United States, 47 Ct.Cl. 146 (1911), aff'd, 233 U.S. 1, 34 S.Ct. 570 58 L.Ed. 823 (1914), a contractor had financed the building of trails, bridges, and shelters, along a postal route of over 400 miles in Alaska, and the acquisition of horses, dogs, and supplies and their transportation to suitable locations along the route. After 2 years, a shorter route was substituted and the plaintiff's 4-year contract to serve the original, longer route was terminated. Despite evident hardship to the contractor, who was prevented by the termination from either fully recouping his investment or earning a profit he could have realized only through continuing operations over the full life of the contract, this court and the Supreme Court of the United States both recognized the authority of the Post Office Department to discontinue, in mid-term, the route established by the original contract, to establish a new and different route, and to engage a different contractor to serve the new route.

The Supreme Court, at page 16 of 233 U.S., 34 S.Ct. 570, expressly disavowed the competence of the Court to substitute judicial discretion for the discretion lodged by the law and the contract in the Postmaster General.

Even earlier, both this court and the Supreme Court had sustained the discontinuance of mail transportation services furnished by one contractor, and the award of a new contract to another, to perform the same services over the same route, when, after a shortening of the original route, the original contractor had refused to engage in negotiations to establish reduced compensation for fewer deliveries. Slavens v. United States, 38 Ct.Cl. 574 (1903), aff'd, 196 U.S. 229, 25 S.Ct. 229, 49 L.Ed. 457 (1905).

Here, some of the points served by the plaintiff's route continued to be served, following termination of his contract, by a different means of transport, at different times and in different sequence, as stops on a new, longer route that touched both terminals of the plaintiff's route but went substantially beyond one of them. Others of the plaintiff's former ports of call were served as parts of other routes. If, despite the Slavens decision, a change in the routes should be deemed essential to sustain the validity of the termination, or to establish that the change amounted to a discontinuance of the original route, the differences in the nature and the pattern of the services furnished here, before and after the termination of the contract, are adequate to establish, as a matter of law, that the old route has been discontinued and no longer exists.

### There Was No Cancellation Under Section 16

The plaintiff contends that, because the letters of April 8 and May 28, 1963, from the contracting officer referred to the termination as a "cancellation" of the contract, the action taken should be regarded as an abortive attempt at cancellation under section 16 of the contract. This contention is ingenious but not persuasive.

The terms of the route service order of May 5, 1963, recording the decision to discontinue the plaintiff's route, make it unequivocally clear that the motivation for the action was a change in the general pattern of mail service in the area, and that the action taken was a discontinuance of the route, not a cancellation for any fault in the plaintiff's performance.

Despite the use of the word "cancel" in the letters notifying the plaintiff of the action, there is no basis for concluding that the plaintiff was misinformed concerning its nature or the reasons for it, or that he suffered any detriment because the letters include a reference to "cancellation."

Everything done in connection with the action makes completely clear that the contracting officer was proceeding under the authority accorded him by section 10.

The indemnity provided for in section 10 was tendered and accepted. Section 16 contains no provision for indemnity.

The reasons for the action stated in the letters were all of the kinds applicable to a discontinuance or change in service under section 10. They had no relevance whatever to the reasons for cancellation specified in section 16.

The expression, in the letter of April 8th, of appreciation for the plaintiff's service, and the informal invitation in that letter to bid on the proposed new routes, plainly disavow any dissatisfaction with the quality or character of the plaintiff's performance, and dispel any inference that otherwise might arise from the use of the word "cancel" that the contract was being terminated for the plaintiff's default.

Even the repeated, inadvertent reference to the irrelevant discontinuance of mail service by the Reading Railroad confirms the purpose of the two letters to notify the plaintiff that the reason for the termination was a rearrangement of the whole pattern of mail deliveries in the area west of Philadelphia, not any fault in his performance.

Nor is there any indication in the record that the plaintiff changed his position to his disadvantage, or suffered any detriment, because the notices used the word "cancel." There is no basis for an estoppel, even assuming that an estoppel might be effective against the United States if grounds for it could be shown.

The fact that the word "cancel" was loosely used in the letters of notification has no legal significance where, as in this case, the actual nature and purpose of the termination are clear, the letters, objectively considered, plainly disclose why the action was taken, and the plaintiff has suffered no detriment as a result of their maladroit phrasing.

Even the United States Supreme Court, in relating the measure of damages for illegally refusing to award a mail service contract to the damages for an illegal termination, did not feel constrained to refrain from using "cancel" and "annul" as synonyms for "discontinue." Mr. Justice Hunt, in the opinion in Garfielde v. United States, 93 U.S. 242 at page 246, 23 L.Ed. 779 (1876), said—

&#42; &#42; &#42; He no doubt knew that this regulation provided that the Postmaster-General could *discontinue* entirely the service for which he proposed, whenever in his judgment the public interests required it, and that for such *discontinuance* one month's pay was to be deemed a full indemnity to the contractor. There was reserved to the Postmaster-General the power to *annul* the contract when his judgment advised that it should be done, and the compensation to the contractor

was specified. An indemnity agreed upon as the amount to be paid for *cancelling* a contract, must, we think, afford the measure of damages for illegally refusing to award it. (Italics supplied.)

### The Effect of Precontract Discussions

Despite whatever assurance the plaintiff received, through his discussion with an unidentified official of the Post Office Department in 1961, before he renewed his agreement, he subsequently accepted the contract without insisting upon deletion or modification of those provisions which authorized its termination in the manner in which it was terminated.

In these circumstances, there is no basis for an estoppel against the defendant, or for recognizing any tacit modification of the terms of the subsequent agreement, that would dissipate the effectiveness of the contractual authority, expressly established by the contract.