Booth, Judge,
reviewing the facts found to be established, delivered the opinion of the court.
The record in this case affords no opportunity for an issue of fact. The evidence is made up of official reports from the Post Office Department and clearly discloses the exact situation.
The claimant company on July 1, 1903 and 1904, entered into contracts with the defendants to transport the mails of the United States over its lines of railway. The service contracted for is carefully arranged by the department and stated officially as the establishment of mail routes, designated in each instance by number. The contracts covering the service consist not of a formally written paper but are concluded by pursuing two distinct steps, viz: The mailing by the department to the company of what is technically termed “ a distance circular.” This paper, forwarded prior to the readjustment period, calls for information as to the distance between stations, etc., on the railroad company’s line. Aside from eliciting information upon which, under section 4002, Eevised Statutes, the department fixes the compensation to be paid for the service, it contains the following clause:
“.In case the Post Office Department authorizes the transportation of mails over this line, or any part of it, the railroad company agrees to accept and perform the services upon the conditions prescribed by law and the regulations of the department.”
*242 If the mail route is established, the second and final movement of the department is the ina.iling to the railroad company of a written order of authorization, which, among other things, expressly states:
“ This adjustment is subject to future orders and to fines and deductions and is based on a service of not less than six round trips per week.”
If thereafter the railroad company transports the mails, the contract is complete and the terms prescribed. Under section 4002, Revised Statutes, these readjustments occur every four years and the contract is coextensive with this period of time.
On the dates mentioned in the preceding contracts there was in full force and effect section 3962, Revised Statutes, as follows: .
“ The Postmaster General, may make deductions from the pay of contractors for failure to perform service according to contract and impose fines upon them for other delinquencies. He may deduct the price of the trip in all cases where the trip is not performed; and not exceeding three times the price of the failure be occasioned by the fault of the contractor or carrier.”
On October 2, 1905, the department promulgated the following regulation:
“ On account of the inferior service resulting from failure to observe the schedule on routes, or parts of routes, on which railroad mail service is not more frequent than seven times a week each way, it is ordered that in certifying to the performance of the service on such routes for, and subsequent to, the quarter ended December 31, 1905, deductions be made at the rate of twenty (20) per cent of the value of each train that arrives at the termini or junction .fifteen (15) or more minutes late, and the aggregate number of late arrivals is ten (10) or more, without satisfactory excuse, in any one quarter, except that no deduction of less than one dollar ($1) will be made.”
On June 26, 1906, the Congress passed the following statute:
“ The Postmaster General shall require all railroads carrying the mails under contract to comply with the terms of said contract as to time of arrival and departure of said *243 mails, and it shall be his duty to impose and collect reasonable fines for delay, when such delay is not caused by unavoidable accidents or conditions.” 34 Stat. L., 467, 472.
Subsequent to the passage of the foregoing enactment the Post Office Department promulgated a series of rules .and regulations covering in minute detail the subject of deductions which would thereafter be made from railway transportation pay for failures upon the part of the company to observe its train schedule. As fully appears from the findings, the claimant company suffered under the regulations for the various remissions shown, a total deduction in this respect of $10,020.40. It is for the recovery of this amount that this suit is brought.
The case presents a dual aspect. It is first sedulously contended that the quadrennial contracts do not in terms or by legal implication obligate the railroad company to transport the mails in accord with its train schedule, or, in other words, its time-tables. Second, there being no Postal Laws or Eegulations nor statutes of the United States in force at the time the contracts were made authorizing the Postmaster General to make deductions for the failure to observe train schedules, Congress could not, during the continuance of the contract period, as it attempted to do by the passage of the act of June 26, 1906, confer the claimed power and authority upon the head of the department; the contract could not be disturbed by legislation prior to its expiration. The settlement of one necessarily concludes the other. We deem it unnecessary to discuss both.
It has long since been settled that the distance circular, authorization order, statutes of the United States, Postal Laws and Eegulations, as well as the practices of the Post Office Department, evidence the contract between the parties for the carriage of the mails, wherever the company performs the service. Eastern Railroad Co. v. United States, 129 U. S., 391; Parker v. United States, 26 C. Cls., 344.
In view of the adjudicated cases respecting the issue raised it is obvious that some power and authority was reserved by the terms of the contracts themselves to the Postmaster General to impose fines and make deductions. The reserva *244 tion of the authority is not questioned in the claimant’s brief; its extent only is challenged. It is true that except for the year 1879-1880 the Postmaster General has not made deductions from the railroads’ compensation for transporting the mails for mere failure to maintain schedules; nor is it possible to identify an express regulation of the department covering the question prior to the one promulgated October 2, 1905, the department contenting itself with deductions for failures to complete a trip or a part thereof. Can it be said, however, that the mere failure to act, no matter if prolonged, destroyed the existing authority to act ? If the authority vested in the Postmaster General under the law, which was concededly part of the contract of carriage, to make the deductions complained of, it is elementary that a mere failure to exercise the same did not. abrogate it.
Section 3962, Revised Statutes, is general as to the extent of authority reserved to the defendants respecting mail contracts and other delinquencies, while the amount of deductions for failure to complete a trip or trips is limited and circumscribed as to cause. There is nothing in the language of the statute which evidences a legislative intent to curtail the authority of the Postmaster General in other respects. Surely it can not be said, in view of the nature of the service to be performed, the absolute necessity for frequency and speed as set forth in section 4002, Revised Statutes, that Congress was expressly recognizing but one failure in the stipulated service as of sufficient importance to warrant the imposition of fines or the making of deductions. On the c'ontrary, the act employs comprehensive terms — “ may make deductions from the pay of contractors for failure to perform service according to contract and impose fines upon them for other delinquencies.” This express reservation would be idle and meaningless if limited in scope and meaning to what follows in the act. The Congress by the statute was aware of the innumerable contingencies possible to arise in the transportation of the mails by rail which might embarrass and impede the administration of the Postal Service and wisely vested in the chief administrative officer of the department a discretion as to fines and deductions *245 upon the happening of events other than those mentioned in the last paragraph of the act. As was said by this court in the Parker case, supra:
“ The vast area of the post-office system, its complexity of routes, the remoteness and distance of its operations from the seat of Government, require that a summary method of dealing with its innumerable contractors and subcontractors shall exist, though its administration may involve instances of individual injustice.”
A railway company offering its services to the Government for the transportation of its mails, under the terms and conditions of existing law, offers its complete facilities for the same. The worth as well as the volume of business given the various roads is predicated in a large measure upon its trip and station schedule, especially so as to competing lines. Time is most generally the very essence of railroad transportation, and it is difficult to perceive upon what hypothesis a company should be immune from observing this feature of the contract as to important intermediate stations on a railway postal route and suffer deductions for failure to traverse the entire route according to schedule. There may be instances when the exception claimed is fraught with infinitely more injury to the Postal Service than the failure for which penalties have uniformly been imposed.
It seems to us that the Post Office Department, in entering into contracts for the transportation of the mails, is not, under the nécessary terms and conditions of the contract, to be precluded from asserting its right to have said mails transported according to the customary and published time cards of the company; that the performance of the service in this respect is a very vital and important facility of a corporation engaged in the transportation of mails; otherwise the railway company may choose its own time. A rural community with but one mail each day is seriously inconvenienced with aii habitual delay in its delivery. The public adapt themselves to the station schedule of the railroad ; and, again, quoting from the Parker case, “ The failure to perform as he has agreed to causes a public incon *246 venience, the value of which can not be proved in dollars and cents or estimated by courts and juries.”
The first paragraph of section 4002, Revised Statutes, provides in part as follows: “ First. The mails shall be conveyed with due frequency and speed.” What reference other than to published time tables can the terms “ due frequency and speed” have? Where is the fact as to this mandatory provision of the law to be ascertained? From what source other than train schedules? Speed and frequency permeate the whole undertaking; it is part and parcel of the facilities which the railway company has to sell, and indeed, to the most profitable mail routes, the chief inducement for the contract -of transportation. The Postmaster General believed that under the contract he possessed authority to make the claimed deductions, for, on October 2, 1905, he initiated a plan for carrying it into effect. It is true the regulations limited the deductions to specified) routes, but this alone did not affect the paramount right. There has never been any doubt as to the existence of the power or that under the contract, laws of the United States, and regulations of the department it was of sufficient breadth to cover every detail of the service, obviously embraced in the very act of carrying the mails by the railroads of the country.
The railroad company accepted the readjustment contract with all the general provisions as to fines and deductions in full force and effect. It knew they became part of the undertaking and thereby assumed the obligation of carrying mails in the way and under the scheme usually and customarily adopted by railroads in the operation of their train service.
It has been often held that the failure to complete a trip or a part of the trip incurs deductions from the compensation earned for that particular trip, cases quite too familiar have sustained the power, and while the issue as to station schedules has not heretofore been before the courts, the reason for its absence is due to the fact that not heretofore has the Postmaster General exercised his authority. It was not until the subject became acute he deemed it necessary to act.
*247 The act of June 26, 1906, supra, confirms this contention. This statute was not legislation conferring a power or authorizing an act. It was in effect a mandatory direction to the Postmaster General to do what he already had the right to do, a limitation of his discretion under section 3962 of the Revised Statutes. “The Postmaster General was authorized to do under section 3962 what he was obliged to do under the act of June 26, 1906.” This, we think, is a sufficient answer to claimant’s second contention. Jacksonville, Pensacola & Mobile R. R. Co. v. United States, 118 U. S., 626; Chicago, Milwaukee & St. Paul R. R. Co. v. United States, 127 U. S., 406; Minneapolis & St. Louis Ry. Co. v. United States, 24 C. Cls., 350.
The claimant company, as shown by the record, acquiesced in the deductions made, accepted the reduced compensation paid without protest or objection, except in one particular instance, and the item complained of was adjusted by the department to its satisfaction. No complaint is made as to the reasonableness of the deductions involved or as to the conduct of the department in any respect, except as to its legality.
In our view of the case the petition must be, and the same is hereby, dismissed. It is so ordered.
Hay, Judge; Downey, Judge; BaRNey, Judge; and Campbell, Chief Justice, concur.