Campbell, Chief Justice,
delivered the opinion of the court:
The plaintiff operated a system of railroad lines, on which postal routes were established. One of these routes extended *314 from Godfrey, Illinois, to Kansas City, Missouri. In 1903 one of its termini was Wann instead of Godfrey. In 1903 the contract for mail transportation was with the Chicago & Alton Railway Company. In 1907 and afterwards it was with the Chicago & Alton Railroad Company. Just when the name was changed or the terms of any reorganization do not appear from the record. Rush Hill was a small station on the railroad where was maintained an agent in the -daytime, with hours from about 6 in the morning to 7 p. m. No agent for the transaction of business was on duty during the night. Two fast trains, carrying mail, passed this station at night, one going east and the other train, No. 9, going west, but neither of them made stops at this station. The train going east at night did not receive or discharge mails at this station, but carried them to a point beyond, where they were transferred to train No. 9 'going west, and by this train they were discharged on its arrival at Rush Hill, where it was scheduled to arrive at 2.50 a. m. The “ outgoing ” mails were taken on by this train by means of the “ catcher ” system, and the incoming mails were thrown off. A messenger was maintained, by the railroad company concerned, to see to it that the outgoing mail was in position to be caught by train No. 9, and that the mail thrown off was cared for. The service of this special messenger involved an expense of twenty dollars per month. There were trains which passed this station in daytime, some of which made stops. The plaintiff’s contention is that it should be reimbursed the expense of the special messenger who attended the night train making no stops. There were a number of other stations on railroad postal routes on plaintiff’s lines where conditions were similar to those at Rush Hill.
The Chicago & Alton Railway Company in 1903 and the Chicago & Alton Railroad Company prior to and after 1907 were transporting the mails under contracts made with the Post Office Department. These contracts fixed the rates of compensation and, among other things, provided that the mails would be transported under the rules and regulations of the department. Admitting that it was bound to take the mails from the post office at Rush Hill to the trains and there deliver them, and likewise to take the incoming mails *315 to the post office, where the trains handling mails arrived in the daytime, the plaintiff contends that it was not bound to render this service at night. But it did render the service. The service covered by the agreed compensation for transporting the mails over this particular route, as upon other routes, included at certain intermediate points, where the distance between the station and post office was less than 80 rods, the handling of the mails by the carrier to and from such office. Some time during the period between July 1, 1903, and June 30, 1907, the railroad company objected to the requirement that, it render the service complained of, because its station office was not open at night, but the department took the opposite view. The department’s construction of its rules and regulations in this regard was therefore well known to the Chicago & Alton Railroad Company when it entered into the contract of 1907 and those of 1911 and 1915. It did not have to enter into the contracts. It was free to accept or refuse the service. Nor could it by the adopted plan of attaching to an acceptance its letter of July 1, 1907, protesting, among other things, “ against the performance of messenger service between post offices and stations at terminal and intermediate points, and between railway stations,” affect the terms of its contract, especially in view of the positive reply thereto by the Postmaster General. It could not and did not impose an obligation upon the Government to pay for a service which the latter insisted, before and after the contracts were made, that the railroad company and not itself should bear under the applicable rules and regulations. An implied contract to pay would not arise under the conditions stated. It was said in Atchison, Topeka & Santa Fe Ry. case, 225 U. S. 640, 649, that public policy requires that mails shall be carried subject to postal regulations and that, in the absence of a contract, the department and not the railroad shall determine the conditions under which it is carried. The generality of terms of the letter of July 1, 1907, weakens its force as a protest, evbn if otherwise a “ protest ” could avail. The basis for this protest, against as many as eight independent elements involved in the mail transportation service, is stated to be in view of certain considerations named in the letter, *316 none of which, it would seem, were either unlawful or unauthorized — “ the reduction of mail pay.” See Divisor cases, 53 C. Cls. 258; 251 U. S. 326. “The withdrawal of empty equipment,” St. Louis, Iron Mt. & Southern Ry. Co. case, 251 U. S. 198; 53 C. Cls. 45; Atlantic Coast Lime Co., 251 U. S. 546. “ Method of ascertaining daily average,” Divisor cases, and the right to impose “ fines and deductions.” Louisville & Nashville R. R. Co. case, 53 C. Cls. 238. See Kansas Gity Southern Ry. Co. case, 252 U. S. 147.
But a protest is not sufficient to create a right. The theory that, if there was some kind of compulsion or duress under which a particular expense is incurred, there is a right of action against the Government to recover such expense overlooks the fact that the recovery, if any, must be based upon contract, express or implied. In the Gibbons case, 8 Wall. 269, 273, it was claimed that oats had been delivered under duress, the Government contending they were delivered under an existing contract. The Supreme Court say that if the alleged contract was the result of duress, there would be no contract, and if the plaintiff’s consent was voluntary, then the contract to which he assented was binding, and add: “ The quartermaster treated the contract as still in force and his demand on the plaintiff was made under that idea. In this he was wrong. But the plaintiff had his option to concur in this view and deliver the balance of the oats or to refuse to deliver any more.” In the case of Holland-America Line, 254 IT. S. 148, it appeared that the United States had furnished certain maintenance and medical care to some aliens brought to this country by the plaintiff’s ships, and presented bills for the cost thereof to the plaintiff, which the latter refused to pay until threatened by the immigration authorities that if the bills were not paid thereafter all aliens would be left aboard the vessels until their admission should be finally adjudicated, and in one instance the threats were actually carried out. It was alleged that this course would delay plaintiff’s vessels for periods varying from a few days to several weeks, and that consequently “ the petitioner paid, under duress and involuntarily, the bills when rendered.” It sued to recover these payments. The court held (p. 155) that the action sounded in tort. We have in *317 the late case of Charles Nelson Co., 56 C. Cls. 448, 457, had occasion, to consider the effect of a protest against the demand to furnish certain lumber where the Government insisted that it had the right to order additional quantities and the contractor insisted that his contract was performed by the delivery of a smaller quantity. He did, however, continue to make deliveries upon the Government’s insistence and sued for these alleged excess amounts. In the opinion by Judge Downey it is said:
“And having furnished additional quantities in compliance with orders specifically predicated on the contract, it can not while complying with such orders create or preserve by so-called protests a right to additional compensation over and above the contract price. We have so held in the recent case of Willard, Sutherland & Co., 56 C. Cls., 413.”
The principle of these cases is applicable here. The plaintiff could not continue the service which the Post Office Department contended was included within the contract and then predicate an action on the fact that it protested against being required to perform. Its remedy was in a refusal to perform. This observation is the more applicable to the claim of the Chicago & Alton Railroad Company, whose contracts were made in 1907 and after, because the service complained of was rendered with full knowledge, when the several contracts were made, that the department construed the rules and regulations as providing for it. As was said by Judge Richardson in Texas & Pacific Ry. Co., 28 C. Cls. 379, 390, “ The contract could not be changed by complaints and protests. It would be a novel principle to introduce into the law of contracts that a contractor for continuous service at agreed prices can raise the price by complaining of the injustice of the contract, while still performing the service and regularly taking pay according to contract price.” The case of Chicago & Alton R. R. Co., 48 C. Cls. 149, is not in conflict with what we hold in the present case. In that case the court refused to allow compensation for the period 1903-1907, because there was a contract, just as we decline to do in the instant case because there were contracts. But in the other case it appeared that when the existing contract had expired the company refused *318 to contract with reference to a route making Jefferson City the terminus and requested that the route be ended at South Cedar City, the end of the company’s line. This declination occurred on May 9, 1907, before the date of the commencement of the proposed new contract July 1, 1907. Again, on June 5th it wrote the department, but had no reply to either of its letters. The opinion states (p. 160) : “ Plaintiff, expecting a new and satisfactory arrangement to be made, continued to carry the mails to Jefferson City until October 1, 1907 that in July it wrote the department that it would not convey the mails across the Missouri River to Jefferson City, except it be paid the amount required of it by the bridge company for such service, but to this last letter the department replied insisting that Jefferson City should be the terminus. Thereupon, in September, the company informed the department that on October 1st it would cease the carrying of mail across the river, and following this the department acceded to the view that the route should end at South Clear City and “ forwarded to plaintiff a new form of contract, agreeing with said order.” The question was upon the company’s right to recover for the service between July 1 and October 1. In the opinion by Judge Atkinson it is said (p. 161) :
“ It is therefore apparent that there was no contract, either express or implied, for carrying the mails on said route from July 1 to October 1, 1907, and that plaintiff company rendered the service under compulsion as a public necessity, and it should in all good conscience be paid therefor.
“From the facts set out in the findings and considering the postal laws and regulations involved in the case, we decide that the claim for additional compensation for the quadrennial period from July 1,1903, to July 1, 1907, which was covered by an express contract, can not be allowed; but the claim of $100 for the period from July 1 to October 1, 1907, for which time no contract existed, should be paid, less the sum of $24.53 already paid, which would be $75.47, and judgment against the United States is accordingly rendered for said amount.”
Plainly the controlling reason for the ruling was that, in the one period, there was a contract, and for the shorter period, during which the service was rendered with full knowledge of the department, there was no contract, and the *319 court’s judgment was for tbe ascertained value of the service upon the whole route, and not for the specific service across the river.
Involved also in plaintiff’s contention is the proper construction of the applicable postal regulations. Confessedly the railroad company was bound to handle mails arriving or departing from Kush Hill in the daytime. The station and post office were about 300 feet apart. So also it is conceded that if the company maintained an agent and kept open its office during the night it would have to provide for the mails incoming and outgoing during the night as well as during the day. If the station had been more than eighty rods from the post office the department would have been bound to handle the mails to and from the trains during night and day. By paragraph 2 of section 1191 of the regulations provision was made for the railroad company taking the mails from and delivering them into all intermediate offices “ not more than 80 rods from the nearest railroad station at which the company has an agent or other representative employed,” and the nest paragraph provides that the department will provide for carriage - of the mails to and from intermediate post offices and postal stations located more than 80 rods from the nearest railroad station, and further that the department shall provide for the carriage “ to and from intermediate post offices and postal stations located 80 rods or less from the railroad station when the railroad company has no agent or other representative employed at such station.” Can it be maintained that it was the company’s duty to look after the mails during the day, but that during the night it was the department’s duty, because an agent was employed during the day but not during the night ? We think not. There is nothing in the regulations from which such a result can be deduced, and it would be an unreasonable deduction from the facts. 'Section 1196 of the regulations provides that the railroad company must retain custody of it “ whenever the mail on any railroad route arrives at a late hour of the night,” and section 1197 provides that when a train departs from a railroad station in the nighttime later than 9 o’clock, “ and it is deemed necessary to have the mail dispatched by such train,” the division *320 superintendent of the Railway Mail Service “will, where mail is taken from and delivered into the post office by the railroad company,” request the company to take the mail to the railroad station at such time as will best serve the interest of the mail service. “ Such mail will be taken charge of by the agent or other representative of the railroad company, who will be required to keep it in some secure place until the train arrives, and then see that it is properly dispatched.” .These provisions are inconsistent with the idea that only the department was bound to look after the mails at intermediate points during the nighttime. The train schedules and stops are usually regulated by the railroad company. The fastest trains are frequently limited and pass through important towns without stops, night or day. Naturally in the development of a proper mail service the mails may be transported on these limited or fast trains. A device for catching the mail bag is used and the mail is thus taken on as the train speeds by, and that designed for the particular station is thrown off in sacks. If the train arrives after 9 o’clock in the nighttime the department could require the company to take charge of the mails, “ and then see that it is properly dispatched” (sec. 1197), where the distance between post office and station was 80 rods or less, and provided an agent was employed at the station. The employment of an agent referred to in the regulation is not confined to day and night service by an agent at the station, but to the fact that an agent is employed during the day or night.
It is not to be assumed that the regulations, which are so specific in most particulars, in provisions for the handling of mails by the company when the post office and station are 80 rods or less away from the station, where an agent is employed, do not provide for the frequently recurring case of a dispatch and receipt of mails by and from the fast night trains making a few stops. Certainly the plaintiff employed an agent at Rush Hill, and thus comes within the letter of the regulations, and, as we think, it comes within the meaning of them as well. The result must, therefore, be the same whether the conclusion be rested upon *321 these considerations or upon those above suggested as to the inefficacy of the supposed protest or compulsion.
The original petition claims compensation for night messenger service during each of the years from June, 1905, to the filing of the petition in June, 1911. What is designated by plaintiff as an “ amended petition ” was filed in January, 1920, nearly nine years after the filing of the original. This “ amended petition ” claims compensation for night messenger service during each of the years from June, 1905, to June, 1917.
A question of practice thus is presented, and also the proper application of the statute of limitations. This statute is jurisdictional in the Court of Claims, and unless a petition is filed within six years from the accrual of the cause of action the claim is barred.
The rules of court provide for amendments and are liberal in that regard. They require, however, that where material amendments are proposed an amended petition shall be filed, and this, when properly filed, takes the place of and supersedes the original or the petition sought to be amended. Where the purpose is to claim items arising upon or growing out of the contract sued upon since the bringing of the action it is usual to file one or more supplemental petitions making the additional claims, if upon seasonable application the filing be allowed.
In the instant case the original petition based the claim upon the contention that the two contracts of June, 1903, and June, 1907, did not require performance of the mail messenger service alleged to have been performed. An amendment of the petition would properly, therefore, relate to the effect of these two contracts. In June, 1911, and again in June, 1915 (each four years), a new contract was made, and whether the mail messenger service was to be performed under such later contracts would be determined from them in connection, of course, with the rules and regulations of the department governing the transaction. In other words, there were quadrennial contracts of 1903, 1907, 1911, and 1915, and the rights and defenses are not necessarily the same under each, because if the defendant insisted *322 that under the contract of 1903 and the regulations there was a duty on plaintiff to handle the mails at night, and the plaintiff took the opposite view, then plainly the matter should have been corrected in the subsequent contract, and if plaintiff made the new contract with full knowledge of the department’s construction of the prior one it could not by a mere objection or protest save a right which its contract should have protected.
If the petition of 1920 were the original petition it is plain that the plaintiff, if entitled to recover, would be limited to items accruing within the six years next preceding its filing. It is equally plain that under the original petition of 1911 there could not be a recovery for items accruing after its filing unless there were additional pleadings. The petition of 1920 could not reach back of six years, there being nothing to bridge the gap between 1911 and 1914.
The plaintiff could have asked leave to file supplemental petitions after suit brought in 1911, or it could have filed independent petitions and asked that the cases be heard together, or that they be consolidated. The court would then determine its proper course. We have held that a consolidation will not be allowed for the sole purpose of providing an appealable amount. The filing of an amended petition that will cover items barred by the statute is not allowable unless the items have been properly protected by supplemental petitions or amendments. The plaintiff’s original petition was considered upon demurrer, along with several other cases involving the same general question, in November, 1918. The demurrer was sustained and the petition dismissed, but the order of dismissal was set aside in February, 1919, upon plaintiff’s motion, alleging that under the rules leave to amend should have been 'given. The amended petition was filed in January, 1920. A demurrer to this amended petition questioned the items arising more than six years prior to its filing. The court, deeming it best to make a finding of facts, overruled the demurrer without prejudice to any question of law that would arise in the case.
• We are referred to two cases — Cafe Ann Granite Co., 20 C. Cls. 1, and Buck's case, 25 C. Cls. 120 — both of which are unlike the instant case in their facts. In these cases the *323 amendments in one case and an amended petition in the other were filed within sis years after the original. In the first case the amendments were in the nature of supplements, setting up claims arising out of a continuing contract. In the other an amended petition set up the entire claim, including that in the original, the later items arising within six years as stated. What is said in those cases under the facts established is not questioned, but it was not supposed that the court, by allowing an amended petition, could supplant the statute of limitations, which is jurisdictional. In a case like the present one the proper course for a plaintiff is to file either a new suit or have leave to file one or more supplemental petitions. If a new petition is filed, application to consolidate or to hear the cases together can then be made. Giving the utmost effect to plaintiff’s pleadings it is apparent that its original petition covers items for six years prior to June, 1911, and the “ amended ” petition covers items within six years of its filirig, and neither of them bridges the gap between 1911 and 1914. However, the plaintiff can not recover in any event, in our view.
The petition should be dismissed. And it is so ordered.
Hat, Judge; Graham, Judge; DowNet, Judge; and Booth, Judge, concur.